*In re* MARRIAGE OF ELIZABETH DICK TIETZ, Petitioner-Appellee, and Cross-Appellant, and CHRISTOPHER MARTIN TIETZ, Respondent-Appellant and Cross-Appellee.

Fourth District   No. 4—92—0160

Opinion filed December 23, 1992.

Vernon H. Houchen, of Decatur, for appellant.

Frederick P. Erickson, of Erickson, Davis, Murphy, Griffith & Walsh, Ltd., of Decatur, for appellee.

JUSTICE KNECHT delivered the opinion of the court:

The marriage of petitioner, Elizabeth Dick Tietz, and respondent, Christopher Martin Tietz, was dissolved on July 25, 1991. The court took under advisement all remaining issues. On October 16, 1991, it filed a memorandum of decision, and on November 15, 1991, entered a supplemental judgment of dissolution resolving all remaining issues. Respondent appeals the supplemental judgment relating to the award of maintenance, the valuation of his law practice, the award of child support, and the division of marital property. Petitioner cross-appeals, contending the court erred in finding respondent did not dissipate the marital assets. We affirm.

The parties were married on July 16, 1976, and separated on September 20, 1990. Two children were born of the marriage, Aaron Carl Tietz, born on March 23, 1982, and Eric Joseph Tietz, born on July 17, 1985. On November 29, 1990, petitioner filed a petition for dissolution of the marriage, and respondent later filed a counterpetition.

At the time of the initiation of the dissolution proceedings, the parties were both 38 years old. Petitioner does not work outside the home. She has a bachelor's degree in education and psychology from the University of Illinois and a master's degree in education from Illinois State University. She taught from January 1976 to the end of the school year in 1981 and then began another job outside the teaching field until their first child was born in 1982. Although she has not returned to work since the children were born, she has maintained her teaching certificate in good standing. Respondent was a practicing attorney at the time the parties married and has continued to practice.

In 1990, petitioner was diagnosed with Bartter's syndrome. This syndrome results from a defect in the kidney which leads to a wasting of potassium and magnesium. The effect of the reduced level of these elements results in muscle weakness which causes fatigue and requires daily rest periods. Petitioner takes medication to compensate for the low potassium and magnesium levels, but has not been restored to her prior health status.

Dr. James Neviackos, a nephrologist, testified it would be inadvisable for petitioner to work outside the home in addition to caring for the children and maintaining the home. He stated it also would be questionable whether she could work if she was not caring for the children. Since teaching required standing for a prolonged period of time, he asserted she may not be able to do this. On cross-examination, he indicated she was totally unable to work and would provide a medical opinion to the Social Security Administration to that effect if asked.

Petitioner is a beneficiary under three trusts: the Carl R. Dick Trust, the Margaret W. Dick Trust, and the Dick Family Trust. Carl R. Dick and Margaret W. Dick were petitioner's grandparents. They had two children, Carl R. Dick, Jr., petitioner's father, and Margaret J. Dick, petitioner's aunt. Carl R. Dick, Jr., had four children, one of which was petitioner.

The Carl R. Dick Trust was established under the terms of Carl R. Dick's will. He died on November 29, 1949. Under the will, the remainder of his estate was placed in trust. Two-thirds of the income from the trust was to be distributed to Margaret W. Dick and one-sixth to be distributed to petitioner's father and aunt each. After Margaret W. Dick's death in July 1956, the income from the trust was divided equally between petitioner's father and aunt. Following petitioner's father's death, his one-half interest was divided between petitioner and her three siblings. If petitioner's aunt dies leaving no children, her share of the trust will be divided between petitioner and her three siblings. At the time of the dissolution proceedings, petitioner's aunt was 70 years old and had no children. As of June 28, 1991, this trust had a present value of $5,230,768.09. The total income distributed from this trust in 1991 was $98,732.82. Petitioner received $12,341.61.

The Margaret W. Dick Trust was established under the terms of her will. The income from this trust was shared equally between petitioner's father and aunt. Upon petitioner's father's death, his half of the trust was distributed to his four children. Petitioner and her three siblings inherited, among other things, approximately 500 acres of farmland. If petitioner's aunt dies leaving no children, her one-half interest will be divided equally between petitioner and her three siblings. As of June 28, 1991, the value of this trust was $1,744,948.98. Petitioner does not receive income from the trust, but does have a remainder interest in the trust if petitioner's aunt predeceases her.

To ensure the farm property which they inherited would remain together, petitioner and her three siblings created the Dick Family Trust. The sole asset of the trust is their undivided one-half interest in the farmland. The other half interest is owned by petitioner's aunt. Under

the terms of the trust, petitioner cannot sell her interest unless two of the other siblings agree. The land in the trust is valued at $503,964.29, and the total distribution of income from the trust in 1991 was $24,394.76, of which petitioner received $6,098.69.

Petitioner began receiving income from these trusts a year after the parties married. During the course of the marriage, petitioner received $347,164.48 from these trusts. Upon the advice of respondent, all the money was placed in a joint account for estate planning purposes. Since the separation, petitioner has placed all money she has received from the trusts in her own money market account. During the course of the marriage, petitioner's aunt also made cash gifts totalling $90,000 to the parties.

On a financial affidavit, petitioner estimated her total monthly expenses were $6,084.25, or $73,011 a year. Her income for 1991 was estimated at $28,811 after taxes. Respondent estimated his monthly expenses were $4,321.23 and his monthly income before taxes was $11,500, or $138,000 a year. During the separation, respondent voluntarily paid the mortgage payments on the house and gave petitioner $1,500 for child support less any other expenses he paid on the children's behalf.

The court awarded petitioner a judgment of dissolution of the marriage and sole custody of the children, and it took under advisement all remaining issues. On October 16, 1991, the court entered a memorandum of decision resolving these remaining issues, and on November 15, 1991, issued a supplemental judgment of dissolution of marriage. The court awarded petitioner the following nonmarital property: (1) her interest in the Carl R. Dick Trust, which it found to be a one-eighth vested interest and a one-eighth vested interest subject to divestment, valued at $937,067.97; (2) her interest in the Margaret W. Dick Trust, with a present value of one-quarter vested remainder interest subject to divestment of $210,396.75; and (3) her interest in the Dick Family Trust, which it found was a one-quarter vested interest with a present value of $130,974.47. The total value of nonmarital assets awarded to petitioner was $1,278,439.19. Respondent was awarded the following nonmarital property: (1) his books and personal papers, and (2) all past and future distributions from his father's estate, valued at $40,000.

The value of marital property awarded to petitioner was $274,454 after deducting the indebtedness assigned to her. The award included (1) the marital residence with an agreed value of $215,000 subject to the mortgage indebtedness of $73,694.87 and a mechanic's lien of $11,804.37; and (2) 50% of petitioner's IRA and 50% of respondent's SEP IRAs. The value of the marital property awarded to respondent

was $261,619.93 after reduction for indebtedness assigned to him. The marital property awarded to him included his interest in his law partnership, which the court valued at $115,000.

The court further ordered respondent to pay petitioner $1,700 per month in child support and $1,100 per month for 36 months in rehabilitative maintenance. After the 36-month period, the maintenance award was subject to automatic review by the court. Both parties filed posttrial motions. The court denied petitioner's motion in its entirety and granted respondent's motion in part. This appeal followed.

## I. MAINTENANCE

In awarding maintenance, the court stated:

"The Court finds that the [petitioner] lacks sufficient current income including the marital property apportioned to her to provide for her reasonable needs in accordance with the substantial standard of living enjoyed by the parties prior to their separation. The Court further finds that the [petitioner] is unable to currently support herself through appropriate employment due to her medical condition of Barter's [sic] Syndrome. While the Court recognizes that the [petitioner] has a substantial interest in the various trusts that constitute her non-marital property, it is the Court's finding that the current income level provided by said trust over which the [petitioner] has virtually no control, are [sic] insufficient to support her in accordance with the standard of living she would have enjoyed but for the dissolution of marriage of the parties. The Court does not find that a permanent award of maintenance is indicated inasmuch as the [petitioner] has a significantly large amount of non-marital property which at a later point in her life will be readily available to her and she is therefore not in a situation where her ability to accumulate assets for the future is of great concern. The Court's primary concern in establishing a rehabilitative maintenance award is the present medical condition of the [petitioner] coupled together with the reduced present income that she enjoys from her significant non-marital holdings. The Court has additionally given due consideration to the duration of this marriage and the age of the parties. The [respondent] has significant income earning ability far in excess of that of the [petitioner], and he will be well able to meet his needs while meeting those needs of the [petitioner] during the period of rehabilitative maintenance which the Court has found to be proper. Additionally, the Court has given due consideration to the tax

consequences of each of the parties and the divergence of the present income in establishing an award of maintenance."

Respondent initially argues the trial court erred in granting maintenance to petitioner. He contends petitioner has sufficient assets in light of the nonmarital and marital property awarded to her to support herself, thereby negating the necessity for maintenance.

Section 504(a) of the Illinois Marriage and Dissolution of Marriage Act (Act) provides a court may grant maintenance only if it finds the spouse seeking maintenance:

"(1) lacks sufficient property, including marital property apportioned to him, to provide for his reasonable needs, and

(2) is unable to support himself through appropriate employment or is the custodian of a child whose condition or circumstances make it appropriate that the custodian not be required to seek employment outside the home, or

(3) is otherwise without sufficient income." Ill. Rev. Stat. 1991, ch. 40, par. 504(a).

Section 504(b) of the Act further directs that the amount and duration of maintenance be determined after the court considers all relevant factors, including:

"(1) the financial resources of the party seeking maintenance, including marital property apportioned to him, and his ability to meet his needs independently, including the extent to which a provision for support of a child living with the party includes a sum for that party as custodian;

(2) the time necessary to acquire sufficient education or training to enable the party seeking maintenance to find appropriate employment;

(3) the standard of living established during the marriage;

(4) the duration of the marriage;

(5) the age and the physical and emotional condition of both parties;

(6) the ability of the spouse from whom maintenance is sought to meet his needs while meeting those of the spouse seeking maintenance; and

(7) the tax consequences of the property division upon the respective economic circumstances of the parties." Ill. Rev. Stat. 1991, ch. 40, par. 504(b).

An award of maintenance is within the discretion of the trial court and will not be reversed on appeal unless it constitutes an abuse of discretion or is against the manifest weight of the evidence. (*In re Marriage of Hensley* (1991), 210 Ill. App. 3d 1043, 1048, 569 N.E.2d 1097,

1100; *In re Marriage of Hart* (1990), 194 Ill. App. 3d 839, 851, 551 N.E.2d 737, 744.) An abuse of discretion occurs where no reasonable person would take the view adopted by the trial court. *In re Marriage of Cheger* (1991), 213 Ill. App. 3d 371, 378, 571 N.E.2d 1135, 1140.

■ The court gave careful consideration to the factors set forth in section 504, and in light of these factors, the award of maintenance is supported by the evidence. The benchmark for determination of maintenance is the reasonable needs of the spouse seeking maintenance in view of the standard of living established during the marriage, the duration of the marriage, the ability to become self-supporting, the income-producing property of a spouse, if any, and the value of the nonmarital property. (*Cheger*, 213 Ill. App. 3d at 379, 571 N.E.2d at 1140.) In her financial affidavit, petitioner stated her monthly expenses were $6,084.25. Her only income is what she receives from the trusts. Her projected income for 1991 from these trusts after taxes was $28,811, or $2,400 per month, leaving a monthly deficit of $3,684.25. As the evidence illustrated, the parties enjoyed a lavish lifestyle during their 15-year marriage. Petitioner has not worked since the birth of the parties' first child, and due to her medical condition, her doctor testified she would be unable to work. Therefore, her potential for becoming self-supporting through employment is limited. The amount she receives from the trusts is far below the standard of living established during the marriage. Respondent earns approximately $138,000 a year and has a net income of $91,146 after taxes. The evidence established that respondent has sufficient income to pay maintenance. Based on petitioner's medical condition and her monthly income from the trusts, petitioner needs maintenance to support herself in the manner commensurate with that established during the marriage. The award of maintenance is not an abuse of discretion or against the manifest weight of the evidence.

Respondent argues petitioner has sufficient nonmarital assets to provide for her support. While petitioner has an interest in three trusts equalling $1,278,439.19, the trial court correctly looked at the current income from these trusts in determining maintenance rather than the full value of her interest. The testimony of the witnesses and the trust instruments themselves establish petitioner has no direct control over the investments or income-earning potential of the trusts, nor over the type or amount of income distributions from these trusts. Rather, these are decisions left to the trustees under the trust document, and petitioner is not empowered to direct the trustees to invest the funds at higher rates or to increase her monthly income. While petitioner may have more control over the Dick Family Trust, because it is a self-settled trust, the provisions of the trust agreement can only be revoked in

whole or in part by an instrument in writing signed by at least three of the four beneficiaries. Petitioner, however, is not required to sell or impair her capital assets to provide for her support where respondent has sufficient income to meet his needs as well as hers. *Cheger*, 213 Ill. App. 3d at 379-80, 571 N.E.2d at 1141; *In re Marriage of Heller* (1987), 153 Ill. App. 3d 224, 234-35, 505 N.E.2d 1294, 1300-01; *Hensley*, 210 Ill. App. 3d at 1050, 569 N.E.2d at 1101.

## II. VALUATION OF RESPONDENT'S LAW PRACTICE

The court awarded respondent his interest in the law practice and valued it at $115,000. It accepted petitioner's valuation of the law practice and testimony that respondent intentionally lessened billings during the initial stages of the parties' separation in an attempt to artificially reduce the accounts receivable of the law practice. On appeal, respondent contends the court erred in valuing his law practice by taking into consideration accounts receivable and accepting petitioner's expert's appraisal of the business.

Both parties presented expert testimony regarding the value of respondent's law practice. Petitioner presented the expert testimony of Robert Disbrow, a certified public accountant. After reviewing respondent's tax returns, bank accounts, depositions, and answers to interrogatories, Disbrow concluded the total value of the law practice was $115,000. In reaching this figure, Disbrow took into account accounts receivable, including billed, unbilled, and receivable for advances, and $50,000 in "[m]issing receivables or fees."

Respondent disputes Disbrow's calculation of "receivables for advances" of $17,774.91 and $50,000 in "missing fees." With respect to the receivables for advances, Disbrow arrived at this figure by taking the money respondent stated was due him as of December 31, 1990, added advances made in 1991, and subtracted the advances recovered. This left a balance of $17,774.91 as of May 31, 1991, and $12,861.67 as of July 12, 1991.

The basis for his calculation of $50,000 in "[m]issing receivables or fees" was a comparison between expected fees and actual fees respondent had collected plus receivables. Looking at respondent's income, tax returns, depositions and answers to interrogatories, his gross fees had been approximately $240,000 a year. The tax returns showed his gross fees were $230,853 in 1988 and $251,973 in 1989. In 1990, his gross fees were $183,535.20. This was a shortfall of approximately $57,000 from his normal average gross fee of $240,000. Respondent had indicated in his deposition that he had not done substantial billing in the latter part of 1990, and he estimated he was owed $32,000 or $33,000. Disbrow

added that figure to $183,000 to arrive at $216,000 as a gross income for 1990. He then compared respondent's income for the first five months of 1990, which was $93,380, with his income for the same time period in 1991, which was $94,277. As the figures reflected, he collected approximately the same amount. Disbrow posited this was wrong because respondent should have received in the first part of 1991 the fees he did not receive in 1990 because he billed late. The uncollected fees in 1990 which were collected in 1991 were not reflected in his 1991 income because his income was essentially the same as it was during the same period in 1990.

Disbrow also compared the amount of income respondent received prior to the separation and that which he received after the separation. For the first nine months in 1990, respondent collected $170,000; for the three months after the separation, he collected only $12,000. Disbrow concluded respondent either reduced his work substantially during this period in question or he did not bill his clients for hours worked. On cross-examination, Disbrow admitted he had not examined the records and books of the law practice. On redirect, he stated he did not believe if he had looked at the books he would have reached a different conclusion because there is usually not much information on unbilled accounts receivable.

Respondent admitted for the first nine months of 1990, prior to the separation, he collected $172,000 in fees, and for the three months after the separation, he received only $12,000. From January to September 30, 1990, he stated he received draws from the law practice of $103,773.15, and after the separation he only had a draw of $795. In fact, he transferred $17,500 into the law practice so the firm could meet expenses. Respondent also admitted testifying at a deposition $32,000 or $33,000 in receivables should have been paid in 1990, but he was delinquent in sending out bills. He stated the money had been paid in 1991, and this money would be included in his 1991 income. Therefore, he would have a "balloon" of $32,000 or $33,000 in his 1991 income. He further asserted he was billing in excess of 200 hours a month, including months he went on vacation. He stated his income in 1988 was $136,000, and $138,000 in 1989. He asserted his 1990 income would have been about the same if the income not billed in 1990 was included. He expected his 1991 income to be relatively the same as in previous years except there would be a balloon payment of $32,000 or $33,000 which resulted from him not promptly billing in 1990.

Respondent's own accountant, Brian Moore, testified the value of the law practice was $41,739. He further testified respondent's 1990 tax return reflected a lesser amount of income than normal. He stated he

reviewed the financial records of respondent and did not find any missing or uncollected receivables as set out by Disbrow.

■ The valuation of assets in an action for dissolution of marriage is a question of fact for the trial court to determine. (*In re Marriage of Stone* (1987), 155 Ill. App. 3d 62, 70, 507 N.E.2d 900, 905.) Any conflicts in testimony concerning the valuation of such assets are matters to be resolved by the trier of fact. (*In re Marriage of Simmons* (1991), 221 Ill. App. 3d 89, 91, 581 N.E.2d 716, 719; *Stone*, 155 Ill. App. 3d at 70-71, 507 N.E.2d at 905.) The trial court's findings thereon will not be disturbed on review unless they are contrary to the manifest weight of the evidence. *Simmons*, 221 Ill. App. 3d at 92, 581 N.E.2d at 719; *In re Marriage of Perlmutter* (1992), 225 Ill. App. 3d 362, 377, 587 N.E.2d 609, 619.

■ Both parties presented evidence regarding the value of respondent's law practice. Based on this evidence, the court accepted petitioner's valuation of the law practice and found respondent intentionally lessened billings during the separation in an attempt to reduce the accounts receivable of the law practice. The trial court had sufficient evidence to reach such a conclusion, and the trial court's valuation of the property, therefore, is not an abuse of discretion or against the manifest weight of the evidence.

Further, it was not error for the court to consider accounts receivable in determining the value of the law practice. Respondent argues accounts receivable are a part of his future earnings and are accounted for in his projected income. Therefore, it would be duplicative to also consider them as a separate asset in valuing the law practice. He contends accounts receivable should not be viewed as marital property subject to distribution, but rather used in the determination of income for support and maintenance. To support his contention, respondent relies on *In re Marriage of Zells* (1991), 143 Ill. 2d 251, 572 N.E.2d 944, and *Head v. Head* (1988), 168 Ill. App. 3d 697, 523 N.E.2d 17.

In *Stone*, this court stated:

"A number of courts have adopted a method for valuation of a partnership or professional practice which includes consideration of:

(a) Fixed assets which include cash, furniture, equipment, supplies and library;

(b) Other assets, including properly aged accounts receivable, costs advanced with due regard for their collectibility; work in progress partially completed but not billed as a receivable, and where completed but not billed;

(c) Goodwill of the practitioner in his business as a going concern; and

(d) Liabilities of the practitioner related to his business."

*Stone*, 155 Ill. App. 3d at 72, 507 N.E.2d at 906-07.

See also *In re Marriage of Leon* (1980), 80 Ill. App. 3d 383, 386-87, 399 N.E.2d 1006, 1009, citing *In re Marriage of Lopez* (1974), 38 Cal. App. 3d 93, 110, 113 Cal. Rptr. 58, 69; *In re Marriage of Rubinstein* (1986), 145 Ill. App. 3d 31, 35-36, 495 N.E.2d 659, 662 (valuation of medical corporation); *In re Marriage of Davis* (1985), 131 Ill. App. 3d 1065, 1069, 476 N.E.2d 1137, 1140 (valuation of corporate law firm); *In re Marriage of Wilson* (1982), 110 Ill. App. 3d 809, 813-14, 443 N.E.2d 31, 34-35 (valuation of timber business partnership); *In re Marriage of Feldman* (1990), 199 Ill. App. 3d 1002, 1005, 557 N.E.2d 1004, 1006 (accounts receivable are business assets and must be included in the practice's valuation); Davis, *Valuation of Professional Practices in Dissolution Cases*, 74 Ill. B.J. 14 (1985).

While the supreme court in *Zells* held neither contingent-fee contracts nor professional goodwill was a marital asset subject to valuation, division or distribution, it did not state accounts receivable could not be considered in valuing a partnership. Respondent points to one paragraph in the *Zells* opinion to support his contention:

"The context for the consideration of fees, *contingent or otherwise*, is in the determination of income for support and maintenance. Fees earned by an attorney contribute to the annual income figures relied upon in awarding maintenance and support. Future earned fees would be considered should the subject of maintenance be revisited." (Emphasis added.) *Zells*, 143 Ill. 2d at 253, 572 N.E.2d at 945.

We hold *Zells* does not apply to accounts receivable. The supreme court was specifically determining whether contingent fees could be included in the marital estate. In reaching its conclusion, the supreme court cited with approval the appellate court's reliance on three factors to conclude contingent fees were not marital assets.

" 'First, the nature of a contingent fee contract indicates that an attorney has neither the right to receive the fee until the case is disposed of, nor any assurance that he ever will receive the fee. Second, the amount of the contingent fee depends on the amount of the award or settlement in the case; therefore its ultimate value, if any, remains highly speculative during the pendency of the case. *** Third, the worth of a contingent fee to an attorney, if any, remains intangible until the firm receives cash or other consideration for the services rendered.' " *Zells*, 143 Ill. 2d at

252-53, 572 N.E.2d at 945, quoting *In re Marriage of Zells* (1990), 197 Ill. App. 3d 232, 237, 554 N.E.2d 289, 292-93.

Clearly, future earned fees, like contingent fees, are not marital assets because their value is too speculative and because they are fees earned in the future. Accounts receivable, however, are distinguishable because they are assets already earned with a known value but have not yet been collected.

*Head* also does not support respondent's proposition. In *Head*, the husband's expert fixed the value of his interest in his professional corporation at $58,000 based on the value of tangible assets. Both parties agreed there was no other evidence presented regarding the value of tangible assets. The trial court, however, valued the business at $175,000 by adding $117,000 to the husband's $58,000 valuation. The court did so by considering the stream of future income and the greater than average revenues earned by the corporation.

The appellate court concluded adding $117,000 to the value of the professional corporation "based upon a stream of future income was error because it result[ed] in a 'double count' of potential future income by considering such income in both the valuation of the asset and considering it in apportioning the total marital assets and awarding maintenance." (*Head*, 168 Ill. App. 3d at 701, 523 N.E.2d at 20.) This case is clearly distinguishable from the case at bar as the trial court did not consider the future income of the partnership or the "greater than average revenues" earned, nor was there a "double count" of future income. Rather, the court valued the partnership by viewing the tangible assets, including accounts receivables, of the law practice. Accounts receivable are only "future income" in the sense they will be collected in the future. The distinction is these fees have already been earned and have a known value. Further, *Head* cited with approval *In re Marriage of Courtright* (1987), 155 Ill. App. 3d 55, 507 N.E.2d 891, and *In re Marriage of Wilder* (1983), 122 Ill. App. 3d 338, 461 N.E.2d 447, which held the value of the tangible assets was a proper basis for the valuation of partnerships. In each case, the court took into consideration accounts receivable.

The trial court did not err in including accounts receivable in valuing the respondent's law practice, and as there was sufficient evidence to support its valuation of the practice, it was not an abuse of discretion or against the manifest weight of the evidence.

### III. Child Support

In determining child support, the court stated it considered the financial resources and needs of the prospective parties and the standard

of living the children would have enjoyed had the marriage not been dissolved. It then found the award of child support in the amount of $1,700 per month was equal to or in excess of the statutory minimum guidelines of 25% of the current net income of respondent. Relying on *In re Marriage of Bush* (1989), 191 Ill. App. 3d 249, 547 N.E.2d 590, and *In re Marriage of Meyer* (1986), 140 Ill. App. 3d 1031, 489 N.E.2d 906, respondent argues the award of child support was an abuse of discretion because it is in excess of any amount needed for the support of two children.

■ An award of child support is a matter within the sound discretion of the trial court and will not be disturbed on appeal absent an abuse of discretion. (*Bush*, 191 Ill. App. 3d at 260, 547 N.E.2d at 596; *In re Marriage of Rogliano* (1990), 198 Ill. App. 3d 404, 410, 555 N.E.2d 1114, 1118.) Section 505 of the Act (Ill. Rev. Stat. 1991, ch. 40, par. 505) provides for the imposition of child-support obligations and determines the amount based upon statutory criteria. The minimum amount for the support of two children is 25% of the supporting parent's net income. (Ill. Rev. Stat. 1991, ch. 40, par. 505(a)(1).) Courts may, however, deviate from these guidelines after considering all relevant factors. Ill. Rev. Stat. 1991, ch. 40, par. 505(a)(2).

■ It is apparent the court took into consideration the statutory factors, and in light of these factors, it was not an abuse of discretion to award petitioner $1,700 per month in child support because it was consistent with the standard of living these children would have enjoyed had the marriage not been dissolved, and the financial resources and needs of the parties.

Further, both *Meyer* and *Bush* are distinguishable from the case at bar. In *Meyer*, the appellate court found the child-support award "greatly exceed[ed] the statutory guidelines," and the trial court had not provided any reason for its substantial departure. (*Meyer*, 140 Ill. App. 3d at 1036, 489 N.E.2d at 910.) Moreover, the court found the award ignored the ability of the noncustodial parent to contribute to the support of the minor child. (*Meyer*, 140 Ill. App. 3d at 1036, 489 N.E.2d at 910.) In the case at bar, the child-support award did not "greatly exceed" the statutory guideline, and the trial court specifically took into consideration both parties' financial needs and resources. Even if the award was greater than the statutory guidelines, the trial court properly took into consideration certain statutory factors in making its determination.

In *Bush*, this court found the overall award of 20% of respondent's net income (approximately $30,000 a year) was an abuse of discretion as it was excessive for a four-year-old child. This court additionally con-

cluded the use of a trust as a "reservoir" for the portion of the 20% not paid directly to petitioner was improper. This court further held "where the individual incomes of both parents are more than sufficient to provide the reasonable needs of the parties' children, taking into account the life-style the children would have absent the dissolution, the court is justified in setting a figure below the guideline amount." *Bush,* 191 Ill. App. 3d at 260, 547 N.E.2d at 596.

The circumstances of the instant case are distinguishable from *Bush.* Petitioner has much less disposable income with which to meet the children's needs than did the custodial parent in *Bush.* Nor can it be determined, as was the case in *Bush,* that the child-support award greatly exceeded the needs of the children or that it resulted in a windfall to them. The award in the present case was not an abuse of discretion.

### IV. DIVISION OF MARITAL PROPERTY

Respondent next asserts the trial court erred in its distribution of the marital assets. He specifically argues petitioner should not have been awarded half of his individual retirement accounts, valued at $120,122.19, and the marital residence should have been ordered sold rather than awarded to petitioner in order to properly divide the marital assets. The thrust of his argument is that the trial court erred in awarding her half of his retirement accounts (as accumulated during the marriage) because she has substantial nonmarital assets while he does not.

■ The Act requires the trial court to divide marital property in "just proportions" considering all relevant factors, including a number of statutory factors. (Ill. Rev. Stat. 1991, ch. 40, par. 503(d); *In re Marriage of Aschwanden* (1980), 82 Ill. 2d 31, 37, 411 N.E.2d 238, 241.) The touchstone of apportionment of marital property is whether the distribution is equitable in nature. (*In re Marriage of Wade* (1987), 158 Ill. App. 3d 255, 268, 511 N.E.2d 156, 165; *In re Marriage of Riech* (1991), 208 Ill. App. 3d 301, 308, 566 N.E.2d 826, 830; *Hart,* 194 Ill. App. 3d at 847, 551 N.E.2d at 741.) The division need not be mathematically equal to be equitable. (*Wade,* 158 Ill. App. 3d at 268, 511 N.E.2d at 165; *In re Marriage of Sheber* (1984), 121 Ill. App. 3d 328, 337, 459 N.E.2d 1056, 1063; *Riech,* 208 Ill. App. 3d at 309, 566 N.E.2d at 830.) The distribution of marital property rests within the sound discretion of the trial court and will not be disturbed absent an abuse of discretion. *Riech,* 208 Ill. App. 3d at 309, 566 N.E.2d at 830; *In re Marriage of Kerber* (1991), 215 Ill. App. 3d 248, 254, 574 N.E.2d 830, 834.

■ Applying these principles, the trial court did not abuse its discretion in dividing the parties' marital assets. The record illustrates the

court conscientiously evaluated the circumstances of the parties and considered all relevant statutory factors before dividing the property. As the figures reflect, the value of the property awarded to each is approximately equal, with petitioner receiving $12,834.07 more. In arguing the distribution of marital assets was improper, respondent again relies on his argument that petitioner has substantial nonmarital assets. As previously stated, she receives approximately $2,400 in monthly income from the trust and does not have access to the principal nor can she direct how the trustees invest the assets or distribute the income. As the court found, she has virtually no control over the income level provided by the trusts. The court's apportionment of the marital assets was not an abuse of discretion considering the contribution of the parties, the value of the property awarded to each, the duration of the marriage, the disparity in income between the parties, the custodial provisions, the desire of awarding the family home to petitioner, and the health status and opportunity of the respective parties. See Ill. Rev. Stat. 1991, ch. 40, pars. 503(d)(1) through (d)(11).

Respondent also argues the marital residence should have been ordered sold because the house is too expensive to maintain based on the parties' income. The parties purchased the marital residence in the fall of 1987 for $190,000. They borrowed $140,000 from petitioner's aunt, Margaret J. Dick, to pay for the house. She took a first mortgage on the residence to secure the loan. The monthly mortgage payments are $1,286.50. The parties have made these monthly payments and, in addition, have made payments on the principal. Over the past several years, petitioner's aunt has made annual gifts to the parties of $10,000 and in one case $20,000. This money was applied to the mortgage. The present balance on the mortgage is approximately $73,000, and the agreed estimated market value of the home is $215,000. The parties also owe a builder $11,804.37 for building an addition on the home. The monthly expenses on the house are $2,485.50 monthly or $29,826 a year.

The trial court determined that in accordance with the best interests of the children and the equitable division of the marital property petitioner should be awarded the home subject to the mortgage and the debt for the addition to the house.

The trial court based its decision to award the home to petitioner on the fact that she would have custody of the two minor children and it would be in their best interest for petitioner to be awarded the home subject to the mortgage and mechanics' lien. This factor has been of great importance in cases reasoning that "[t]he adverse effect which dissolution of a marriage has on children is self-evident. Therefore, where possible, children should be afforded continuity in their environ-

ment in order to reduce the emotional disruption caused by the separation of their parents. One of the ways this can be accomplished is by affording the children continued residence in the family home." *In re Marriage of Brenner* (1981), 95 Ill. App. 3d 100, 102, 419 N.E.2d 400, 402; see also *In re Marriage of Wiley* (1990), 199 Ill. App. 3d 169, 178-79, 556 N.E.2d 809, 815; *Sheber*, 121 Ill. App. 3d at 338-39, 459 N.E.2d at 1064; *In re Marriage of Legge* (1982), 111 Ill. App. 3d 198, 209, 443 N.E.2d 1089, 1097; *In re Marriage of Kush* (1982), 106 Ill. App. 3d 233, 236, 435 N.E.2d 921, 923.

■ In dividing the marital property, the trial court is to consider the custodial provisions made for any children and the desirability of awarding the marital residence to the spouse having custody of the children. (Ill. Rev. Stat. 1991, ch. 40, pars. 503(d)(4), (d)(8).) Since petitioner was awarded custody of the two minor children, assignment of the house to her was justified. Moreover, the court took into consideration the estimated value of the house in dividing the assets, and considering the income of the parties and other relevant statutory criteria, the award of the marital residence to petitioner appears appropriate.

### V. DISSIPATION OF MARITAL ASSETS

On September 14, 1990, prior to their separation on September 20, 1990, respondent withdrew $35,976.17 from the parties' cotenant savings account, leaving a balance of $1,000 in the account. To withdraw money from this account, both signatures of the parties were required. Petitioner had signed the withdrawal slip, but respondent had not indicated to her how much he intended to withdraw or for what purpose. The funds withdrawn were transferred into respondent's personal checking account at the First of America Bank, from which petitioner cannot withdraw. The balance of the checking account after the deposit was $37,552.95. Respondent thereafter transferred $20,000 from his checking account into his savings account at Magna Bank. The balance in his savings account after the deposit was $51,707.68. The money in this account was also not subject to withdrawal by petitioner.

A total of $145,195.42 was deposited in respondent's checking account between September 14 and the date of the trial, including the $35,976.17 transferred from the parties' joint account, and $90,000 transferred from his Magna Bank savings account into his checking account. A total of $144,112.19 was withdrawn from the account during this time period, including the $20,000 transferred from his checking account to his savings account.

In an attempt to explain how he spent the money, respondent testified he wrote five checks on September 14 to (1) American Express for

$1,866.69, (2) the Internal Revenue Service for $8,287, (3) the Illinois Department of Revenue for $860, (4) Illinois Bell for $24.16, and (5) another check for $33.56. He also presented the following exhibit outlining the deposits and withdrawals made on the account during the period of September 14 through the time of trial:

"*5. Personal checking account (Christopher M. Tietz)*

a. 9/10/90 balance                                                     $ 1,576.82

b. 9/14/90 deposit from First of America Bank savings account                                                                 35,976.17

c. 9/14/90 transfer to Magna savings account (ck[.] [N]o. 2878)                                                             (20,000.00)

d. 11/7/90 deposit from Jeffrey D. Richardson, payment on notes                                                                  3,000.00

, e. 6/17/91 deposit from Soy Capital Bank, loan proceeds for payment of [F]ederal income tax estimate             13,000.00

f. 6/27/91 ck[.] to Soy Capital Bank to repay loan for tax estimate (ck[.] [N]o. 3171)                                  (13,028.49)

g. 10/22/90-6/27/91 deposits from Magna savings account                                                               93,000.00

h. 9/25/90—6/25/91 interest earned                                       193.47

i. 1/17/91 voiding ck[.] [N]o. 2990 (dated 1/14/91)                         4.00

j. 1/25/91 adjustment to reconcile account                               21.78

Subtotal,                        $113,743.75

k. Checks to Internal Revenue Service for [F]ederal income tax estimate, ([N]os. 2879, 2989, 3083 and 3157)         (42,574.00)

l. Checks to Internal Revenue Service for [S]tate income tax estimate ([N]os. 2880, 2977, 3084 and 3136)             (4,320.00)

m. Checks to Macon County Collector for real estate taxes ([N]os. 3134 and 3135)                                       (2,984.25)

n. Checks to Margaret J. Dick trust for payments on note ([N]os. 2884, 2921, 2957, 2975, 3003, 3028, 3050, 3104, 3133 and 3172) [(mortgage payments)]                                    (12,865.00)

o. Checks to Elizabeth D. Tietz (or for her benefit)    (14,750.00)

p. Checks to Maynor Rentals for apartment rent ([N]os. 3001, 3002, 3032, 3066, 3110, 3132 and 3172)    (4,550.00)

q. Checks for cash ([N]os. 2951, 2958, 2978, 2980, 3080, 3106, 3147 and 3160)    (3,900.00)

r. Checks for payment of other marital debts and Christopher M. Tietz' living expenses    (25,140.45)

[Total Expenditures    111,083.70]

Current balance    $ 2,660.05."

In regard to dissipation of marital assets, the trial court found respondent presented sufficient evidence of necessary and proper expenditures of the funds removed from the parties' savings account, and therefore no dissipation.

Petitioner argues by cross-appeal respondent had the burden of showing by clear and specific evidence how the money he withdrew was spent, and his explanation for the last two figures, the $25,140.45 (item "r" above) as "payment of other marital debts and *** living expenses," and the $3,900 expenditure (item "q" above) as "checks for cash" was inadequate to meet this burden. Because respondent failed to meet his burden, petitioner contends the trial court erred in not finding respondent's withdrawal of at least $29,000.40 constituted dissipation under section 503(d)(1) of the Act (Ill. Rev. Stat. 1991, ch. 40, par. 503(d)(1)).

■■ When dividing marital property, a court must consider the dissipation of the value of marital and nonmarital property. (Ill. Rev. Stat. 1991, ch. 40, par. 503(d)(1).) Dissipation is defined as the use of marital property for one spouse's sole benefit for a purpose unrelated to the marriage at a time when the marriage is undergoing an irreconcilable breakdown. (*In re Marriage of Seversen* (1992), 228 Ill. App. 3d 820, 824, 593 N.E.2d 747, 749; *Hensley*, 210 Ill. App. 3d at 1053, 569 N.E.2d at 1103; *In re Marriage of Adams* (1989), 183 Ill. App. 3d 296, 301, 538 N.E.2d 1286, 1289.) Whether a given course of conduct constitutes dissipation depends upon the facts of the particular case. (*Seversen*, 228 Ill. App. 3d at 824, 593 N.E.2d at 749; *Adams*, 183 Ill. App. 3d at 301, 538 N.E.2d at 1290; *In re Marriage of Drummond* (1987), 156 Ill. App. 3d 672, 683, 509 N.E.2d 707, 715.) The spouse charged with dissipation of marital funds has the burden of showing, by clear and specific evidence, how the marital funds were spent. (*Adams*, 183 Ill. App. 3d at 301, 538 N.E.2d at 1290.) When the funds are spent for legitimate family expenses, and necessary and appropriate purposes, there is no dissipation. (*Hensley*, 210 Ill. App. 3d at 1053, 569 N.E.2d at 1103.) The explanation

given by the spouse charged with dissipation as to how funds were spent requires the trial court to determine his or her credibility. (*Adams*, 183 Ill. App. 3d at 301, 538 N.E.2d at 1290; *In re Marriage of Rai* (1989), 189 Ill. App. 3d 559, 565, 545 N.E.2d 446, 449.) If expenditures are not documented adequately by the person charged with dissipation, courts will affirm a finding of dissipation. (*Rai*, 189 Ill. App. 3d at 565, 545 N.E.2d at 450.) General and vague statements that funds were spent on marital expenses or to pay bills are inadequate to avoid a finding of dissipation. The issue of dissipation is generally a question of fact, and the trial court's finding concerning dissipation will not be disturbed unless it is against the manifest weight of the evidence (*Seversen*, 228 Ill. App. 3d at 824, 593 N.E.2d at 749; *Rai*, 189 Ill. App. 3d at 565, 545 N.E.2d at 450) or an abuse of discretion (*Drummond*, 156 Ill. App. 3d at 683, 509 N.E.2d at 715).

In the present case, respondent undisputedly withdrew the funds when the marriage was experiencing an irretrievable breakdown. Through his testimony and summary of transactions of his checking account, respondent specifically accounted for how these funds were spent. The money was spent on legitimate expenses for taxes, mortgage payments, voluntary monthly payments to petitioner, and various living expenses incurred by both parties. These were appropriate expenditures and should not result in a finding of dissipation. While his explanation of "payment of other marital debts and *** living expenses" and "checks for cash" to account for $29,000.40 is vague, respondent only transferred $35,976.17 into his checking account from the parties' joint checking account, while he paid bills and expenses totalling $111,083.70, well in excess of the amount he withdrew from the parties' joint account. Since respondent presented sufficient evidence to establish the money withdrawn was used for appropriate purposes, and there was no evidence of wilful dissipation of marital assets, the court did not abuse its discretion in finding no dissipation.

For the foregoing reasons, the judgment of the trial court is affirmed.

Affirmed.

LUND and GREEN, JJ., concur.