*In re* MARRIAGE OF MARY ANNE REYNARD, Petitioner-Appellant, and CHARLES G. REYNARD, Respondent-Appellee.

Fourth District   No. 4—03—0015

Opinion filed December 18, 2003.

McCULLOUGH, J., specially concurring.
MYERSCOUGH, J., dissenting.

Alan I. Weintraub (argued), of Thomson & Weintraub, of Bloomington, for appellant.

Helen E. Ogar (argued), of Lawrence, Moore & Ogar, of Bloomington, for appellee.

JUSTICE COOK delivered the opinion of the court:

Petitioner, Mary Anne Reynard, appeals the December 31, 2002, order of the Coles County circuit court dissolving Mary Anne's marriage to respondent, Charles G. Reynard, and awarding Mary Anne maintenance in the amount of $1,600 per month until the first to occur of the following contingencies: (1) the death of either party; (2) Mary Anne's remarriage; (3) Mary Anne's cohabitation with another person on a resident, continuing, conjugal basis; or (4) completion of the January 1, 2013, payment. We affirm.

## I. BACKGROUND

Mary Anne and Charles were married on January 29, 1969. They had two children: Rachel born in 1977 and Meghan born in 1982. On March 6, 2001, Mary Anne filed a petition for dissolution of marriage. On December 31, 2002, the trial court entered a judgment of dissolu-

tion of marriage and an order that addressed maintenance and the division of assets.

Both Mary Anne and Charles earned college degrees. Mary Anne earned her degree in English and took all of the required undergraduate teaching classes. After graduation from college, Mary Anne and Charles accepted teaching positions. Charles also attended law school at night. Upon graduation from law school in May 1974, Charles became a McLean County assistant State's Attorney. The new job required the parties to move from Chicago to Bloomington/Normal, Illinois. Mary Anne, having just been promoted at Wells Recruiting Systems, quit her job and began work in Bloomington/Normal as a Hertz Rent-A-Car clerk and then as a child-care worker in a day-care center.

Mary Anne became a homemaker in 1977 after the birth of the parties' first child, Rachel. In 1978, Charles entered the private practice of law. In 1979, Charles unsuccessfully ran for McLean County State's Attorney. Mary Anne managed Charles's campaign and cared for Rachel. To lend help financially, Mary Anne also became a part-time employee at the Regional Office of Education.

On October 14, 1982, Meghan was born. That same year, Mary Anne began hosting parties in people's homes for the sale of country decorating merchandise. Mary Anne was successful and in one year earned $20,000 gross. She stopped hosting, however, after Meghan entered kindergarten in order to be home every night during the children's school years.

After losing the 1979 election, Charles returned to private practice. In 1987, Charles was appointed as the McLean County State's Attorney. He ran for election in 1988 and for reelection in 1992 and 1996. Mary Anne assisted in all three campaigns by setting appointments, distributing materials, and holding campaign meetings in the home.

Mary Anne testified her responsibilities for the care of the parties' children did not allow for full-time employment. Charles acknowledged that in addition to being his most significant volunteer in political campaigns, Mary Anne was a good mother, helped out family finances through part-time employment, and had stuck with him through difficult times.

At the time of hearing, Meghan was a first-semester sophomore in college. Charles paid between $2,900 and $3,400 per month to Wellesley for Meghan's schooling. This figure does not include other expenses such as medical and travel. Mary Anne was 54 years old and in good health. She did receive psychotherapy and massages for fibromyalgia. Mary Anne worked as the coordinator of volunteers and college interns

at the McLean County Museum of History. She began the position in May 1999 and earned $29,819 per year. Prior to this position, Mary Anne had been a part-time special education teaching assistant at University High School for three years and a part-time teaching assistant at Metcalf Lab School for seven years. She never acquired a teaching license in Illinois because it was not required to teach as a special education teaching assistant and was not required in parochial schools. Charles was 56 years old and also in good health. He had recently won an election for circuit court judge of McLean County. His projected earnings were $136,546 per year.

The trial court assigned Mary Anne 52% of the marital assets valued at $346,495. The marital assets Mary Anne received included the parties' marital residence valued at $166,000, a 1999 Honda CR-V, a $1,082 Citizens Savings Bank account, and four Salomon Smith Barney accounts. Mary Anne received $48,404 in nonmarital assets, including $11,167 in jewelry and a $37,237 reimbursement from the marital estate for the nonmarital contribution Mary Anne made to a Salomon Smith Barney account.

Charles received $319,487 in marital assets, including a home valued at $108,000 with an 80% mortgage remaining, four Salomon Smith Barney accounts, and the parties' marital interest in a condominium lived in by the parties' daughter Rachel. The condo is valued at $107,000 and also has an 80% mortgage. The trial court also awarded Charles a 1996 Ford Windstar and a 2001 Ford Taurus. The Taurus has a car loan for its full $15,000 value. In terms of nonmarital property, Charles received quantities of stocks and funds acquired by gift, legacy, or descent from his mother, a $106,771 reimbursement from the marital estate, and $12,906 of nonmarital debt in the form of a campaign loan. The court noted Charles has paid nearly all of Meghan's educational expenses to date, and he indicates a willingness to continue making those payments. The court ordered Charles to continue paying Meghan's educational expenses and her car insurance. Finally, the court determined each party is entitled to 50% of the other's retirement benefits to be paid through a QILDRO (qualified Illinois domestic relations order).

When fashioning the maintenance award, the trial court considered the parties' financial-affairs affidavits. Mary Anne's affidavit indicated her average monthly expenses were $4,527. Mary Anne prepared the affidavit on May 24, 2001, averaging her expenses for the prior 12 months, although the parties separated on July 10, 2000, and she filed for divorce on March 6, 2001. The affidavit included many expenses for Meghan, who resided with Mary Anne when she prepared the affidavit. Meghan now lives elsewhere. At hearing, Mary Anne admitted

her income had increased since she had prepared the affidavit. Mary Anne also admitted some of her expenses were anticipatory, such as the amounts for replacing appliances, her education, and payments to the Internal Revenue Service. When she prepared the affidavit, Charles was paying all of her household bills, including medical bills and food. The court adjusted Mary Anne's projected expenses for gardening, snow removal, household help, replacement of appliances, food, clothing, psychotherapy, lunch money, vacations, retirement plan, Internal Revenue Service, and America On-Line. The court determined a more realistic estimate of Mary Anne's expenses at the time of hearing was $3,060 per month.

Charles's financial-affairs affidavit indicates his monthly net income from all sources, including interest and dividend payments is $7,973. His total average monthly expenses are $8,542.38, including expenses for Meghan but not including a maintenance payment.

The trial court found that although the parties established a good standard of living during the marriage, they did not enjoy a lavish lifestyle. "They took vacations and provided a comfortable home for their two children. They maximized use of the automobiles and promptly paid their bills. Both Mary Anne and Charles have modified their lifestyles since their separation."

At hearing, Mary Anne called Dennis Knobloch to present calculations of each party's net disposable, after-tax income at varying rates of maintenance. Knobloch testified that to equalize the parties' net disposable incomes, the trial court should award maintenance somewhere between $3,700 per month and $3,800 per month. Knobloch admitted his calculations were purely mathematical and did not consider statutory factors in determining maintenance. The court did not challenge Knobloch's methodology in calculating the parties' net disposable incomes, but it noted the analysis failed to consider Charles's contribution's toward Meghan's college educational expenses. The court awarded Mary Anne maintenance in the amount of $1,600 per month until the first to occur of the following contingencies: (1) the death of either party; (2) Mary Anne's remarriage; (3) Mary Anne's cohabitation with another person on a resident, continuing, conjugal basis; or (4) completion of the January 1, 2013 payment.

The trial court found Mary Anne's monthly net income, including the $1,600-per-month maintenance award, to be $3,040. In addition to this income, at the time of trial, Mary Anne received $300 per month from a boarder and a $3,547 federal income tax refund for the year 2001.

Notably, the trial court found:

"Charles['s] [f]inancial [a]ffairs [a]ffidavit seems to demonstrate an

inability to pay maintenance in the court-ordered amount. Nevertheless, Charles has income-producing assets and a borrowing ability that will enable him to meet this obligation. A higher maintenance obligation would adversely affect his ability to meet his own needs, resulting in a greater sacrifice by Charles in his standard of living than by Mary Anne in hers. The $1,600 maintenance award affects the lifestyles of both parties, but avoids creating a substantial lifestyle deficit for either of them."

## II. ANALYSIS

On appeal, Mary Anne argues she is entitled to a maintenance award of $3,750 a month to equalize the parties' net disposable incomes.

■ "Maintenance issues are presented in a great number of factual situations and resist a simple analysis." *In re Marriage of Mayhall*, 311 Ill. App. 3d 765, 769, 725 N.E.2d 22, 25 (2000). The trial court has discretion to determine the propriety, amount, and duration of a maintenance award. A reviewing court will not reverse the trial court's maintenance determination absent an abuse of discretion. *In re Marriage of Dunlap*, 294 Ill. App. 3d 768, 772, 690 N.E.2d 1023, 1026 (1998). Section 504(a) of the Illinois Marriage and Dissolution of Marriage Act (Dissolution Act) (750 ILCS 5/504(a) (West 2000)) sets forth factors the court must consider when determining the amount and duration of maintenance awards. These factors include the income and present and future earning capacity of the parties; the needs of each party; any impairment of earning capacity due to devoting time to domestic duties or having forgone or delayed opportunities due to the marriage; the time necessary to acquire appropriate education, training, and employment; the ability of the party to support himself or herself; the standard of living established during the marriage; the duration of the marriage; the age and physical and emotional condition of the parties; contributions and services by the party seeking maintenance to the education, training, or career of the other spouse; and any other factor the court expressly finds to be just and equitable. 750 ILCS 5/504(a) (West 2000). The court is not required to give the factors equal weight and has broad discretion to "grant a temporary or permanent maintenance award for either spouse in amounts and for periods of time as the court deems just." 750 ILCS 5/504(a) (West 2000).

When determining the amount and duration of a maintenance award, the trial court must strike a balance that is reasonable under the circumstances in light of the goals of section 504. This court in *Mayhall* considered whether the 1993 amendments to section 504(a) under Public Act 87—881 (Pub. Act 87—881, § 1, eff. January 1, 1993

(1992 Ill. Laws 1019, 1023)) changed the focus of the Dissolution Act. *Mayhall*, 311 Ill. App. 3d at 768, 725 N.E.2d at 24. The 1993 amendments require the court to consider a spouse's "domestic duties" when determining the amount and duration of maintenance (750 ILCS 5/504(a)(4) (West 2000)) and remove the requirement that the court find one of the previously listed conditions under section 504(a) before awarding maintenance (*In re Marriage of Koberlein*, 281 Ill. App. 3d 880, 883, 667 N.E.2d 695, 698 (1996)). The focus of the Dissolution Act as enacted in 1977 was to "obviate marriage-conditioned needs and to enable a formerly dependant spouse to acquire financial independence for the future." *Mayhall*, 311 Ill. App. 3d at 768, 725 N.E.2d at 24. The court in *Mayhall* concluded "although the 1993 amendments made it easier for maintenance to be awarded, the amendments did not change the underlying approach that maintenance should only be awarded when necessary. Maintenance is not the absolute right of every party to a marriage." *Mayhall*, 311 Ill. App. 3d at 768, 725 N.E.2d at 24.

■ We approach an award of maintenance with these goals in mind. The benchmark determination when awarding maintenance is the "reasonable needs of the spouse seeking maintenance in view of the standard of living established during the marriage, *** the ability to become self-supporting, the income-producing property of a spouse, if any, and the value of the nonmarital property." *In re Marriage of Tietz*, 238 Ill. App. 3d 965, 972, 605 N.E.2d 670, 676 (1992). The trial court fashions an award of maintenance on the basis of the circumstances disclosed by the evidence at the time of the hearing. *In re Marriage of Sisul*, 234 Ill. App. 3d 1038, 1040, 600 N.E.2d 86, 88 (1992). The trial court in this case invoked the benchmark determination, considered the relevant factors set forth in section 505(a) of the Dissolution Act, and awarded Mary Anne maintenance of $1,600 per month.

■ Mary Anne argues she is entitled to a maintenance award that equalizes the parties' net disposable incomes. Neither the Dissolution Act nor Illinois case law requires the equalization of incomes. 750 ILCS 5/504 (West 2000); *In re Marriage of Claydon*, 306 Ill. App. 3d 895, 902, 715 N.E.2d 1201, 1205-06 (1999). "While the touchstone of proper apportionment is whether the division is equitable in nature, a just division does not require mathematical equality, given the range of factors to be considered by the trial court." *Koberlein*, 281 Ill. App. 3d at 887, 667 N.E.2d at 700 (several factors supported the trial court's award of limited maintenance to ex-wife: ex-husband received custody of the parties' son, ex-wife received one-half of the marital property and will be receiving $91,000 over the next 10 years, the modest

marital standard of living, and the ex-wife's relatively young age of 51).

■ Equalization of the parties' incomes may be appropriate in some cases. Marriage is a moral and financial partnership of coequals. *In re Marriage of Hart*, 194 Ill. App. 3d 839, 853, 551 N.E.2d 737, 745 (1990) (Steigmann, J., specially concurring). It is inequitable upon dissolution to saddle a party with the burden of her reduced earning potential and to allow the other party to continue in the advantageous position he reached through their joint efforts. *Hart*, 194 Ill. App. 3d at 853, 551 N.E.2d at 745 (Steigmann, J., specially concurring).

Mary Anne made a significant contribution to the family during the parties' 33 years of marriage by working part-time, raising the parties' children, and managing Charles's election campaigns. Mary Anne gave up her employment in Chicago to move to Bloomington/Normal for Charles's job as an assistant State's Attorney. She gave up her successful stint as a hostess for the sale of country decorating merchandise to be with her children. She campaigned for Charles during the 1979, 1988, 1992, and 1996 elections for McLean County State's Attorney. Although Mary Anne took all the requisite course work, she never obtained her teaching license.

Despite Mary Anne's significant sacrifices and contributions, we cannot say the trial court abused its discretion by awarding Mary Anne maintenance in the amount of $1,600 per month. The facts of this case do not rise to the level necessary to equalize the parties' net disposable incomes.

Mary Anne's monthly expenses at the time of trial were $3,060 per month. Her monthly net income, after factoring in the $1,600-per-month maintenance award, was $3,040. Mary Anne has other means to meet her needs. Mary Anne also received $300 per month from a boarder; she got a $3,547 federal income tax refund in 2001; and the trial court awarded her $346,495 in marital assets and $48,404 in nonmarital assets, including a $1,082 savings account, a $37,237 reimbursement from the marital estate, and four Salomon Smith Barney accounts.

The parties do have disparate earning capacities. See 750 ILCS 5/504(a)(3) (West 2000). Mary Anne worked part-time and raised the children while Charles pursued a career as an attorney. "[W]hen former spouses have grossly disparate earning potentials, the goal of financial independence may not be achievable because of the dependent former spouse's inability to maintain the standard of living shared during the marriage." *In re Marriage of Charles*, 284 Ill. App. 3d 339, 348, 672 N.E.2d 57, 64 (1996). Mary Anne, however, has the ability to become self-supporting. "She is a good salesperson with a college

education and can be expected to supplement her salary with her own business income." Mary Anne worked part-time during the majority of 33 years of the parties' marriage. Her former jobs included teaching positions in special education and a Catholic school. Although Mary Anne does not have a teaching license, she could seek similar positions that do not require a license. In addition, Mary Anne demonstrated her business skills during her successful stint as a hostess for the sale of country decorating merchandise. Her domestic duties did not substantially impair her earning capacity. Further, Mary Anne indicated an interest in obtaining additional education. She is young and healthy enough to achieve this goal.

A higher maintenance award would adversely affect Charles's ability to meet his own needs. Charles indicated in his affidavit that his monthly expenses are $8,542.38 and his monthly income is $7,973. The trial court found Charles's affidavit demonstrates he has income-producing assets and a borrowing ability that will enable him to meet a maintenance obligation of $1,600 per month. The court was concerned, however, with Charles's ability to pay more maintenance than the court ordered. Both parties' expenses exceed their incomes. Mary Anne, however, has no house or car payment and was assigned no debt. Charles must pay two mortgages, a car payment, college expenses for Meghan, and a $12,000 premarital campaign loan.

The trial court admitted the standard of living of both parties decreased after the parties separated. See 750 ILCS 5/504(a)(6) (West 2000). This can be expected to some degree because two houses are more expensive to maintain than one. During the marriage, the parties did not enjoy a lavish lifestyle. They took frugal vacations, maximized use of their automobiles, and promptly paid their bills. The court fashioned the maintenance award to avoid creating a substantial lifestyle deficit for either party. The court carefully considered the relevant evidence and achieved an appropriate balance between Mary Anne's needs and Charles's ability to pay. Considering the marital and nonmarital award, maintenance, and Mary Anne's marketable skills, we are confident she can achieve financial independence. If problems develop in the future, the maintenance award is modifiable under the provisions of the Dissolution Act.

Mary Anne requests this court reexamine *Claydon* because *Claydon* does not follow the progeny of Illinois maintenance cases that came before it and *Claydon* places an inequitable burden on parties seeking spousal support. We do not read *Claydon* to foreclose or discourage equalization of incomes in appropriate cases. *Claydon* merely reemphasizes that neither case law nor the Dissolution Act requires equalization of incomes. *Claydon*, 306 Ill. App. 3d at 902, 715

N.E.2d at 1205-06. Further, *Claydon* does not place a new burden on the party seeking maintenance. On the contrary, *Claydon* invokes the benchmark for determination of maintenance cited by *Tietz*, which Mary Anne asks us to follow. *Claydon*, 306 Ill. App. 3d at 903, 715 N.E.2d at 1206-07. The benchmark determination weighs the reasonable needs of the spouse against other relevant factors. *Claydon*, 306 Ill. App. 3d at 903, 715 N.E.2d at 1206-07. The court in *Claydon* does not require the spouse seeking maintenance to file an affidavit with more specificity than the other spouse as Mary Anne suggests.

## III. CONCLUSION

The circuit court did not abuse its discretion when determining Mary Anne's maintenance award. We affirm.

Affirmed.

JUSTICE McCULLOUGH, specially concurring:

I concur and agree with this opinion in the determination that the trial court did not abuse its discretion in determining the maintenance award.

First and foremost, questions as to maintenance " 'are presented in a great number of factual situations and resist a simple analysis' " (344 Ill. App. 3d at 790, quoting *Mayhall*, 311 Ill. App. 3d at 769, 725 N.E.2d at 25); the trial court determines the propriety, amount, and duration of maintenance; and the reviewing court is not the trier of fact in reweighing the factors set forth in section 504(a).

Our disposition makes it clear that the maintenance ordered by the trial court is subject to modifications pursuant to the Dissolution Act. The dissent points to the present college expenses paid for Meghan's education and the ex-husband's substantial income in working and retirement years and concludes that maintenance should be set now at $3,750 per month and the ex-wife should be required to pay one-half of the college expenses. 344 Ill. App. 3d at 795. To do this, we would simply be the trier of fact.

JUSTICE MYERSCOUGH, dissenting:

I respectfully dissent. I would reverse the trial court's award of maintenance as an abuse of discretion. Mary Anne was clearly entitled to additional maintenance. She contributed and sacrificed 33 years of her life as wife, mother, and campaign worker. She now has a much lower present and future earning capacity, unmet needs, greater age, lesser physical and emotional capabilities, and lowered standard of living. Moreover, she has clearly made a good-faith effort to support herself.

The trial court erroneously criticized Mary Anne's expenditures and cast a blind eye on Charles's affidavit and testimony. Mary Anne's estimates were just as realistic as Charles's. The court refused to require Charles to sell assets but required Mary Anne to do so.

Charles was ordered to pay Meghan's college expenses of $2,900 to $3,400 per month to Wellesley plus expenses such as medical and travel. Even so, Charles will have substantially more disposable income during his working and retirement years than Mary Anne. At a minimum, Mary Anne should have received $3,750-per-month maintenance with the responsibility of paying one half of Meghan's expenses.

Although Illinois law does not require an equalization of net disposable income in large-income cases (*Claydon*, 306 Ill. App. 3d at 902, 715 N.E.2d at 1205-06), the needs of the parties must still be met where possible. While this couple did not live an extravagant lifestyle so they could afford to send their children to college, they enjoyed substantial income, which should not be retained in large part by Charles, especially where, here, it was because of Mary Anne's sacrifices and significant contributions to the family during the parties' long marriage that Charles is able to have a greater earning capacity than does Mary Anne. As the majority points out "[i]t is inequitable upon dissolution to saddle a party with the burden of her reduced earning potential and to allow the other party to continue in the advantageous position he reached through their joint efforts" (344 Ill. App. 3d at 792), and that is what the trial court did in this case.

For these reasons, the trial court's award was contrary to the manifest weight of the evidence and an abuse of discretion, and I would reverse.