**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2023 IL App (3d) 220126-U

Order filed August 14, 2023

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2023

| | | |
|---|---|---|
| *In re* MARRIAGE OF KEITH YEARMAN, | ) ) ) | Appeal from the Circuit Court of the 18th Judicial Circuit, Du Page County, Illinois. |
| Petitioner-Appellant, | ) | |
| | ) | Appeal No. 3-22-0126 |
| and | ) | Circuit No. 17-D-2165 |
| | ) | |
| NADIA YEARMAN, | ) | The Honorable |
| | ) | Susan L. Alvarado, |
| Respondent-Appellee. | ) | Judge, Presiding. |

_____

JUSTICE PETERSON delivered the judgment of the court.
Justices McDade and Brennan concurred in the judgment.

_____

**ORDER**

¶ 1     *Held*: In an appeal in a dissolution of marriage case, the appellate court found that the trial court did not err in: (1) requiring the petitioner to proceed to a bench trial without first forcing respondent to comply with petitioner's discovery requests and the trial court's discovery orders; (2) awarding temporary maintenance and maintenance to respondent; (3) determining respondent's dissipation of marital assets; and (4) certain other aspects of its ruling. The appellate court, therefore, affirmed the trial court's judgment.

¶ 2     Petitioner, Keith Yearman, filed a petition for dissolution of his marriage to respondent,

Nadia Yearman. After a bench trial, the trial court entered a judgment dissolving the parties'

marriage and dividing the parties' property. Keith appeals, arguing that the trial court erred in (1) requiring him to proceed to a bench trial without first forcing Nadia to comply with his discovery requests and the trial court's discovery orders; (2) awarding temporary maintenance and maintenance to Nadia; (3) determining Nadia's dissipation of marital assets; and (4) certain other aspects of its ruling. We affirm the trial court's judgment.

¶ 3                                    I. BACKGROUND

¶ 4         Keith and Nadia were married in September 2002. One child, A.Y., was born during the marriage in January 2011. In October 2017, Keith, who was represented by an attorney at the time, filed a petition for dissolution of marriage. A few days later, Keith filed an emergency petition for temporary sole parenting time and decision-making responsibility as to A.Y., claiming that Nadia had engaged in detrimental behavior. Among other things, Keith alleged in the emergency petition that the United States Drug Enforcement Administration (DEA) had raided the apartment where Nadia and A.Y. had been staying with a male subject and had found a large amount of illegal drugs in the apartment.

¶ 5         In November 2017, at the first court appearance date on the petitions, the trial court appointed a guardian *ad litem* (GAL) to represent A.Y.'s interests in the proceedings. The trial court subsequently ordered that the parties would split the GAL fees and that Keith would pay 80% of those fees.

¶ 6         Later that same month, Nadia, who was also represented by an attorney at the time, filed a counterpetition to Keith's emergency petition, along with some other documents. In the counterpetition, Nadia alleged that A.Y. had been conceived while Keith was out of the country for an extended period and that A.Y. was not Keith's child. Nadia sought to have the trial court

2

order the parties to submit to DNA testing and to declare the nonexistence of a parent-child relationship between Keith and A.Y.

¶ 7　　　　In January 2018, Keith filed a motion for involuntary dismissal of Nadia's counterpetition, claiming that Nadia had failed to raise her challenge to Keith's paternity within the time period allowed by statute (see 735 ILCS 5/2-619(a)(5) (West 2018) (providing for involuntary dismissal of an action that is barred by the applicable statute of limitations); 750 ILCS 46/205(b) (West 2018) (requiring that an action to declare the nonexistence of a parent-child relationship be brought within two years after the filing party knew or should have known of the relevant facts)). The trial court subsequently granted Keith's motion to dismiss.

¶ 8　　　　In March 2018, Nadia filed a petition for temporary maintenance, child support, and interim and prospective attorney fees (collectively referred to, at times, as the temporary maintenance petition). In the temporary maintenance petition, Nadia alleged, among other things, that she and Keith had been married for over 15 years; that one child, A.Y., was born during the marriage; that Keith earned a substantial income as a professor at a local community college; that Nadia earned a small amount working as a school bus monitor; that Nadia was the primary caretaker of the minor child throughout the marriage; that Keith's income and assets had provided for the financial support of Nadia during the marriage; that Nadia was dependent upon Keith for her financial support; and that Nadia lacked sufficient assets and income to support herself or the minor child consistent with the standard of living that the parties had established during the marriage. In support of her request, Nadia attached to the temporary maintenance petition her affidavit, which was not verified or notarized, and the affidavit of her attorney. According to Keith, however, no financial documentation was tendered or submitted to support Nadia's request for temporary relief.

3

¶ 9        In April 2018, Nadia filed a petition for rule to show cause seeking to have Keith held in

contempt for failing to tender his financial affidavit and supporting documents as required by

local rules and as ordered by the trial court. Nadia noted in the motion that she had produced her

financial affidavit in December 2017 within the time frame allowed under the local rules. Keith

sought an extension of time to tender his financial information (before the petition for rule was

filed), but the trial court essentially denied his request. Keith tendered his financial affidavit and

supporting documents shortly thereafter.

¶ 10        Later that same month (April 2018), a hearing was held on Nadia's temporary

maintenance petition. After briefing and, presumably, oral argument on the matter, the trial court

granted Nadia's request and set the amounts to be paid by Keith as approximately $2482 per

month for temporary maintenance and approximately $711 per month for temporary child

support.[1] A withholding order was entered to that effect. The trial court also ordered Keith to pay

$3400 to the law firm representing Nadia for interim and prospective attorney fees.

¶ 11        In June 2018, Keith's attorney withdrew from the case, and Keith began representing

himself in the proceedings. Over the next three years, the case moved slowly through the trial

court with Keith filing numerous self-represented petitions and motions, Nadia not responding to

those documents, and the trial court often not specifically ruling on those documents. In June

2018 (and again in August 2018), Keith filed a motion to terminate temporary maintenance and

for reimbursement of the temporary maintenance that had already been paid, claiming that Nadia

had been engaged in a resident, continuing, and conjugal relationship with another individual,

Efren Rodriguez-Diaz, during her marriage to Keith. According to Keith, Nadia had been

_____

[1] The transcript from the April 2018 proceeding has not been made part of the record on appeal in this case, and there is no indication in the record presented whether the trial court made its ruling on Nadia's temporary maintenance petition summarily or after an evidentiary hearing was held.

4

involved in a dating relationship with Rodriguez-Diaz since at least 2015 and had resided permanently with Rodriguez-Diaz from approximately July 2017 to October 2017. Keith indicated in the motion that Nadia and Rodriguez-Diaz's shared apartment had been raided by the DEA in October 2017 and that drugs and approximately $188,000 had been seized from the apartment.

¶ 12    In August 2018, Keith filed three motions to compel. In the first motion, Keith sought to have Nadia sign a release for discovery purposes so that Keith could obtain a copy of the DEA reports from the October 2017 raid. With the second motion, Keith sought to have Nadia pay any tax liability that Keith incurred as a result of having to file his income taxes using the disadvantageous married-filing-separately status due to Nadia's illicit activities. In the third motion to compel, Keith sought to have the trial court order Nadia to obtain substantial, gainful, and legal full-time employment.Two months later, in October 2018, Keith filed motions to strike Nadia's December 2017 and October 2018 financial affidavits, claiming that the affidavits failed to include several of Nadia's assets. Keith later withdrew his motions to strike and his first two motions to compel.

¶ 13    Also in October 2018, a hearing was held on a request that Nadia had made for the payment of additional interim and prospective attorney fees. During the hearing, Nadia was questioned under oath about some of her assets. The trial court allowed Nadia to assert her fifth amendment right not to answer questions pertaining to the DEA's seizure of the money. Later in the questioning, when the trial court asked Nadia who owned the real property in Mexico, she stated, "My mother. And La Quinta is under my name." On redirect examination, however, Keith did not ask any additional questions about the real property in Mexico, even when the trial court

5

specifically asked Keith whether he had any further questions in relation to the trial court's inquiry of Nadia about La Quinta.

¶ 14    In closing arguments, when Keith referred to the DEA's seizure of the money, Nadia's attorney objected, claiming that Keith's argument in that regard was not connected to the evidence that had been presented. The trial court implicitly sustained the objection and indicated to Keith that he could only argue the evidence that had been admitted. The trial court pointed out that no testimony had been presented as to the money that had been seized and that it was improper, therefore, for Keith to make arguments about the money. Keith asserted later in his closing argument that Nadia had a college degree and could be making a higher income but was not applying herself. When the trial court asked Keith about the statutory language that required the trial court to equalize the amount that the parties had spent on attorney fees, Keith commented:

> "When they [respondent and her attorneys] aren't presenting the full picture or even close to the full picture, how can I defend myself against this motion when they don't give me the interrogatories, when they don't give me a complete list of assets, when she's holding assets in Mexico and you can't get a fair market value. There's nothing I can do."

¶ 15    At the conclusion of the hearing, the trial court granted Nadia's request and ordered Keith to pay $15,000 of additional interim and prospective attorney fees to Nadia's attorneys on Nadia's behalf. In announcing its decision, the trial court noted that a significant factor that it had considered was that Keith's manner of representing himself (filing 34 subpoenas and 11 motions since the last interim fee award had been made) was making the litigation more costly and more difficult for Nadia to participate in. As for the property in Mexico, the trial court commented:

6

"There was some testimony about this property in Mexico. The Court does not have sufficient information one way or the other. I don't know the value of this. I don't know its fair market value. I don't know how much income to impute to Mrs. Yearman for that, if any. I just know little about that. So it's difficult for me to impute income to Mrs. Yearman as it relates to this property without more information."

¶ 16    In March 2019, after paying $1500 of the additional $15,000 interim and prospective attorney fees awarded, Keith filed for bankruptcy in federal court. He later notified the trial court in the instant case of his bankruptcy filing. The following month, Nadia's attorneys withdrew from the case. From that point forward, Nadia represented herself in the proceedings, the same as Keith.

¶ 17    In June 2019, Keith filed a petition for leave to continue discovery so that he could try to find out more information about whether Nadia had undergone fertilization procedures without Keith's knowledge, consent, or sperm when Nadia had become pregnant with A.Y. A few months later, Keith filed a multiple count petition in the trial court, seeking to (1) recalculate temporary maintenance and child support; (2) continue discovery as to whether a legal parent-child relationship existed between Keith and A.Y.; (3) set a final date for Keith to file a possible petition to declare the nonexistence of a parent-child relationship between Keith and A.Y.; and (4) compel disclosure of certain documents by Nadia. As to the first part of the petition, Keith claimed that his yearly earnings had gone down since the trial court had set temporary maintenance and child support and sought to have his payments reduced accordingly. With regard to the second part of the petition, Keith sought to continue the discovery process for matters relating to whether Nadia had undergone fertilization procedures such that a legal parent-

7

child relationship would never have existed between Keith and A.Y. (according to Keith). Keith maintained in his petition that Nadia and her attorneys' failure to disclose that information resulted in the appointment of a GAL, the imposition of a child support obligation upon Keith, and the unwarranted expenditure of time and money. In the third part of the petition, Keith sought to have the trial court set a final date for Keith to challenge his paternity of A.Y. so as to resolve any confusion that existed as to the time frame for Keith to do so. With the fourth part of the petition, Keith sought to compel disclosure of Nadia's 2017 and 2018 tax documents and tax returns, marital interrogatories, records relating to Nadia's assets in Mexico, and documents relating to the seizure of the money by the DEA.

¶ 18    In November 2019, a status hearing was held in this case. When Keith complained to the trial court about Nadia's failure to tender some of the documents at issue, the trial court ordered Nadia to turn over her records on fertilization procedures by a certain specified date and instructed Keith to file a motion to compel as to Nadia's financial documents. Apparently, the trial court did not realize at that time that Keith had already filed the equivalent of a motion to compel as part of his prior petition (part four). A few months later, after Nadia had failed to tender her records on fertilization procedures (Nadia had only tendered some records from 2005 and had not tendered any records from March or April 2010 when A.Y. was conceived), Keith filed a motion to compel the release of the records. Keith also sought in that same motion to require Nadia to provide answers and related documents to Keith's marital interrogatories; to turn over Nadia's 2017, 2018, and 2019 tax returns; to tender any documents relating to the DEA's seizure of the money; and to turn over any records relating to Nadia's ownership of property in Mexico. Keith attached to the motion various supporting documents, including some of Nadia's medical records from March 2010 showing that Nadia had gone to see a doctor for

8

infertility issues and to inquire about starting fertilization procedures and a printout of an official legal notice posted by the DEA in January 2018 showing the seizure of approximately $188,000 from Nadia.

¶ 19    In January 2020, the trial court entered an agreed order stating that Keith was not the biological father of A.Y., terminating Keith's parenting time and support obligations, and discharging the GAL from the case. Nadia was given sole custody and exclusive allocation of all parental responsibilities and permission to amend A.Y.'s birth certificate accordingly.

¶ 20    The following month, Keith filed a petition seeking to have the trial court find that Nadia had committed fraud upon the court, to rule that all orders in this case were void *ab initio*, and to have sanctions imposed upon Nadia. Keith also sought to be reinstated as A.Y.'s father and to have his name placed back on A.Y.'s birth certificate as such. Keith pointed out in the petition that Nadia had obtained temporary maintenance, child support, and contribution toward her attorney fees based, according to Keith, upon false information that Nadia had presented about her income. In addition, Keith noted, a GAL was appointed in this case due to Nadia's failure to report that she had conceived through fertilization procedures without Keith's knowledge, consent, or sperm, and Keith was ordered to pay 80% of the GAL fees. Keith also filed a request seeking to have Nadia produce her tax documents and income tax returns for 2017, 2018, and 2019; all records pertaining to the DEA's seizure of the money; all records of bank accounts held by Nadia; all records of any asset in the possession of another person or entity in which Nadia had an interest; all credit card statements for accounts in Nadia's name from January 2015 to the present date; Nadia's credit report listing all accounts past and present; all records pertaining to real estate in which Nadia had acquired an interest during the marriage; copies of deposits made

9

to Nadia's accounts by other individuals; and records relating to Nadia's fertilization procedures and the conception of A.Y.

¶ 21    At a status hearing in March 2020, the trial court addressed Keith's request to produce and/or motions to compel in depth and had Keith state on the record the specific financial documents that he was seeking from Nadia. As Keith did so, the trial court asked Nadia questions about each category of assets or information to which Keith's document request pertained. Nadia was not under oath at the time and denied that she had held any savings accounts in her name alone or jointly with any another person since 2015. As the trial court's inquiry continued, Keith raised the issue of the money that had been seized by the DEA. Nadia protested, claiming that the prior trial court judge had stated that the matter had nothing to do with the parties' divorce case due to the fifth amendment. The current trial court judge agreed and allowed Nadia to assert her fifth amendment rights on that issue. During additional questioning about other matters, Nadia indicated that she had acted as a cosigner for another person who was buying a truck and that the other person had stopped paying on the loan. Nadia also denied that she had any interest in any real estate, including any real estate in Mexico. At the conclusion of the status hearing, the trial court entered a written order requiring Nadia to produce within 10 days her 2017, 2018, and 2019 tax returns; all credit card statements from the date of divorce (presumably, the filing of the dissolution petition) to the present date; her current credit report; and her answer to all interrogatories.

¶ 22    In July 2020, at the next status hearing, an initial bench trial date was set. In addition, both parties were ordered to issue written discovery within 30 days and to respond to discovery requests by a certain specified date. The written order provided further that neither party would

10

be allowed to present at trial any document that he or she had failed to exchange by the discovery cutoff date.

¶ 23   Later that same month, Keith filed a motion to compel disclosure of certain documents; to make the marital estate whole; and to vacate the prior awards of temporary maintenance, child support, and interim attorney fees (collectively referred to as Keith's three-part motion). In the first part of the motion, Keith sought to have Nadia turn over all statements from her accounts at Chase and U.S. Bank and any other accounts in which her name was listed or she had an interest, including any accounts to which she had transferred money from her known accounts. As for the second part of the motion, Keith sought to have the trial court require Nadia to disclose all of her assets and bank accounts, to sanction Nadia for failing to disclose certain assets, and to order Nadia to reimburse the marital estate for all assets that she had dissipated. With regard to the third part of the motion, Keith sought to have the trial court vacate the April 2018 award of temporary maintenance, child support, and interim attorney fees; to order Nadia to reimburse Keith for all maintenance and child support that Nadia had received; to require Nadia's former attorneys to reimburse Keith for the interim attorney fees Keith had paid on Nadia's behalf; and to impose sanctions and other penalties against Nadia and her former attorneys, such as the payment of Keith's legal fees.

¶ 24   A short time thereafter, the trial court held a hearing on Keith's three-part motion. At the conclusion of the hearing, the trial court granted Keith's motion in part and ordered Nadia to produce within 30 days all documents referenced in the motion. The trial court denied, however, Keith's request to be reimbursed for the interim attorney fees he had paid on Nadia's behalf. As for the other issues raised in Keith's motion, the trial court continued those matters until the bench trial date.

¶ 25    In August 2020, Keith filed a request to produce, seeking to have Nadia turn over her tax documents and tax returns for 2017, 2018, and 2019; all records relating to the DEA's seizure of the money; all documents pertaining to any checking, savings, or other accounts held by Nadia alone or with another person from January 2015 to the present date, regardless of whether that account had been closed; all records of any asset in which Nadia had an interest; charge and credit card statements from January 2017 to the present date; all records pertaining to real estate in which Nadia had an interest, including real estate in Mexico; Nadia's current credit report listing all accounts past and present; and certain records relating to the conception of A.Y.

¶ 26    Two months later, in October 2020, Keith filed a motion for summary judgment (labeled a petition) and certain other relief due to Nadia's failure to comply with Keith's discovery requests. Keith indicated in the motion that Nadia had not provided any documents in response to Keith's request to produce, that Nadia's answer to Keith's marital interrogatories was incomplete and unsworn, and that Nadia had not tendered any of her tax documents or asset information to Keith. Among other things, Keith sought to have the trial court enter summary judgment in his favor; to order that Nadia be required to pay all of the legal and GAL fees in this case, including those incurred by Keith; to require Nadia to reimburse Keith for all of the temporary maintenance and child support that Keith had paid; and to impose sanctions upon Nadia.

¶ 27    In November 2020, a status hearing was held on Keith's motion for summary judgment. During the hearing, Keith complained to the trial court that Nadia had failed to tender most or all of the discovery items he had requested. Nadia disputed Keith's claim in that regard and told the trial court that she had tendered all of the requested documents to Keith. The case had previously been set for a bench trial that was scheduled to begin in a few days. The trial court indicated that it was not going to continue the trial and commented to the parties, "[w]e're going to go to trial.

12

And if nobody presents any evidence, I'll just have to make up a judgment. That's all I can say. All right." The trial court told the parties further, "[e]verybody bring all of their documents, all of their tax returns, bank statements, debts, anything, everybody bring that morning. It will take forever, but we'll get through it." It does not appear from the record that the trial court took any further action on Keith's motion for summary judgment.

¶ 28    A few days later, at the bench trial date that had been set, the trial court realized that an issue still remained as to the paternity of A.Y. and postponed the trial. The trial court questioned Nadia, and she denied that A.Y. had been conceived through fertilization procedures, admitted that Keith was not A.Y.'s father, and stated that Keith had known from the beginning of the divorce case that he was not the biological parent. The trial court ordered the parties to submit to DNA testing to determine the paternity of A.Y.

¶ 29    In addition, to help streamline the upcoming trial, the trial court questioned the parties about their assets and debts. Keith raised the issue of the DEA's seizure of the money in Nadia's name and indicated that he believed Nadia should not have received temporary maintenance because the seized amount should have been treated as part of Nadia's income. The trial court responded, "[t]hat's all water under the bridge at this point." After some additional discussion on the matter, the trial court commented, "if I don't have proof that this was illegal money that was hers and I don't, I can't consider it."

¶ 30    When the trial court asked if there were any other financial issues in the case, Keith pointed out that he had filed a motion to compel Nadia to find gainful legal employment two years ago but was never able to get the motion heard. The trial court told Keith that it could require Nadia to perform a job search or that it could impute income to Nadia, which, with Nadia's minimum wage job history, would be about $20,000. Keith responded, "[o]kay."

13

¶ 31    Keith also raised the issue of whether Nadia owned property in Mexico. Keith told the trial court that although Nadia had not listed property in Mexico in her financial affidavits, she had previously admitted in court that her name was on some of her family's property in Mexico. The trial court questioned Nadia about the matter, and she denied that she owned any property in Mexico. Keith stated that he would order a transcript from the prior proceeding.

¶ 32    A few months later, in February 2021, Keith filed several motions and petitions in the trial court. The first such document that Keith filed was a motion to compel Nadia to turn over all records relating to the conception of A.Y. Keith indicated in the motion that based upon the information contained in some of Nadia's medical records that Keith had subpoenaed, the timing of the medical procedures that Nadia had undergone to address infertility issues, and the approximate date of A.Y.'s conception, it was likely that A.Y. had been conceived through fertilization procedures. Keith noted that Nadia had previously been ordered to tender the records regarding fertilization procedures but had only turned over records from 2005 (A.Y. was born in 2011). In addition, according to Keith, Nadia had been inconsistent in her responses in court about the matter. Keith asserted further in the motion that by withholding the truth, Nadia's prior attorneys had prolonged the case, obtained interim awards, and generated additional billable hours.

¶ 33    The second document that Keith filed in February 2021 was a motion to compel Nadia to turn over her bank statements and related information. In the motion, Keith set forth a detailed history of Nadia's failure to disclose her bank accounts and other assets in this case. Keith pointed out that Nadia (and her attorneys) had filed her first financial affidavit in December 2017 and had only disclosed one bank account, a bank account that was held by Keith and Nadia jointly at a local credit union. The December 2017 financial affidavit omitted that Nadia also had

14

an individual account at Chase Bank (account number 0936), which was the same account from which Nadia had paid her attorneys about a month before the December 2017 financial affidavit had been filed. Keith obtained information about the Chase Bank account by issuing a subpoena to Chase. According to Keith, the deposits to the Chase Bank account did not match the income and gifts shown on Nadia's financial affidavit or the income that Nadia had reported to the Internal Revenue Service (IRS). In addition, Keith maintained, Nadia had begun to dissipate the funds in the Chase Bank account immediately after she had been served with the divorce papers. Nadia (and her attorneys) also withheld from the December 2017 financial affidavit the existence of a second Chase Bank account (account number 6575) that Nadia had held jointly with an individual named Juan Jose Leon-Gonzalez, who Keith did not know. Nadia was questioned in court about the matter in March 2020 (but not under oath) and denied having any other bank accounts. Keith had also learned that Nadia had an additional bank account at U.S. Bank, which she had failed to disclose. Keith pointed out that he had filed his petition for dissolution of marriage in October 2017 and that since that time, Nadia had not turned over a single bank statement. The only bank statements that Keith had received were ones that he had subpoenaed directly from the banks. Keith stated further that he had filed multiple petitions relating to discovery in the trial court and that the trial court had issued multiple orders pertaining to those petitions, but Nadia had failed to comply with those orders. The only bank document that Nadia had turned over was a letter from U.S. Bank listing the account number, opening date, and current balance of her account, which Keith thought was an insufficient response to his discovery request.

¶ 34     The third document that Keith filed in the trial court in February 2021 was a petition seeking to have the trial court find that Nadia had committed perjury and fraud upon the court

15

through the filing of her December 2017 financial affidavit—which failed to list multiple bank accounts, a vehicle, real estate, rental income, and cash seized by the DEA—and through her filings and representations to the trial court relating to her assets and to the conception of A.Y.

¶ 35    The fourth document that Keith filed in the trial court in February 2021 was a petition to vacate temporary maintenance, for full restitution, and for sanctions. Keith indicated in the petition that at the November 2020 status hearing, Nadia had tendered several documents in response to Keith's repeated discovery requests. Keith did not believe, however, that those documents complied with the legal requirements for temporary maintenance. Keith asked, therefore, that temporary maintenance be terminated and that an order for full restitution (as to both temporary maintenance and temporary child support) be entered.

¶ 36    The fifth document that Keith filed in February 2021 was a notice of intent to claim dissipation. In the notice, Keith sought to set the date of the irretrievable breakdown of the marriage for dissipation purposes as March 17, 2010, the date that Nadia had asked her doctor to start fertilization procedures without Keith's knowledge, consent, or sperm. Keith alleged in the notice that the following assets had been dissipated by Nadia: (1) approximately $16,000 from Chase Bank individual account number 0936; (2) approximately $17,000 from Chase Bank joint account number 6575; (3) approximately $188,000 seized by the DEA; (4) the undetermined value of a Nissan Titan truck; (5) the undetermined value of real property in Mexico; (6) the undetermined proceeds of rental income from the parties' townhome in Carol Stream, Illinois; (7) other possible undeclared assets and income; (8) various sums incurred in relation to A.Y., a child who was born out of wedlock (according to Keith), and as a result of Nadia's paternity fraud; (9) approximately $138,000 for real properties in Chicago that the parties owned but that Nadia had never helped to maintain; and (10) an additional approximately $15,000 tax burden

16

that Keith had incurred as a result of having to file his income tax returns using the disadvantageous married-filing-separately status due to Nadia's illicit activities.

¶ 37    In April 2021, Keith filed a petition for sanctions against Nadia for failing to tender the DNA test results. According to Keith, Nadia had received the test results in December 2020 but had failed to tender the results to Keith or to file the results with the trial court. Keith had subpoenaed the results in March 2021 and had received the results shortly thereafter. The results showed that Keith was not the biological father of A.Y. and that another specifically identified male subject (not Keith or Rodriquez-Diaz referred to previously) was A.Y.'s biological father. Later that same month, an order was entered in the trial court stating that Keith was acknowledging that he was A.Y.'s father, even though the documents and the merits indicated otherwise. That order, however, was vacated shortly thereafter.

¶ 38    In June 2021, Keith filed a motion for default judgment. In the motion, Keith asked the trial court to enter a default judgment against Nadia because of Nadia's repeated failure to respond to the various petitions and motions that Keith had filed, her concealment of assets, the true method of conception of A.Y., and her failure to provide all relevant discovery materials or to answer marital interrogatories in any logical manner. In the motion, Keith listed approximately 18 different petitions or motions that he had filed in this case that were still pending and that had not been responded to by Nadia (there was one additional motion or petition to which Nadia had not responded that the trial court had struck).

¶ 39    Also in June 2021, a status hearing was held on discovery in this case. When Keith was asked about the matter during the hearing, the following conversation ensued:

> "[KEITH]: Well, Nadia still has not turned over any of the legally required bank statements. She was awarded temporary maintenance back in 2018 and state

17

law says with the application for temporary maintenance it shall be accompanied by bank statements.

I have repeatedly petitioned the Court for assistance; motions to compel, petitions for rule.

THE COURT: Okay, sir, we're here for status. So I get it; so she's not complying.

[KEITH]: She still hasn't turned any of that stuff over.

THE COURT: Okay. You already have a trial date coming up in August so what I would like to do, sir, is I'm going to give you what's called a trial status date.

[KEITH]: Okay.

THE COURT: And what that means is you're to come into court one week before, which will be on August 19th, and you're going to bring to court on that date every single document that you intend to introduce into evidence at trial, okay?

[KEITH]: Okay."

At the conclusion of the status hearing, the trial court entered a written order requiring each party to comply with all outstanding discovery requests by a certain specified date. In addition, the trial court's written order indicated that because Keith had acknowledged that he was not A.Y.'s father, pursuant to the DNA test results, the related issues of parenting time, child support, and college expenses would not go to trial. The trial court again discharged the GAL from the case.[2]

---

[2] It is unclear from the record whether the GAL was reappointed in this case after he was initially discharged in January 2020 or whether that portion of the January 2020 order was subsequently vacated.

¶ 40 The following month, at the next discovery status hearing, the trial court ordered the parties to exchange all exhibits, exhibit lists, and witness lists; to organize all of their trial documents into a binder; and to provide a copy of their trial binders to the other party and to the trial court.

¶ 41 In October 2021, a day before the scheduled bench trial date, Keith filed a petition for a finding of nonpaternity *ab initio*. The trial court later struck that petition as untimely. The following day, the bench trial began. The trial took three days to complete. Both parties were present in court for the bench trial and represented themselves in the proceedings. A Spanish interpreter was also present to interpret for Nadia. Each of the parties had prepared a new financial affidavit and had tendered that document to the trial court at the beginning of the trial.

¶ 42 During the bench trial, testimony was presented from Keith, Nadia, and Keith's father. In addition to the testimony, the parties also presented various exhibits, including their current financial affidavits, one of Nadia's prior financial affidavits, various bank records, vehicle title information, the final report from Keith's 2019 bankruptcy case, Keith's recent paycheck and income tax return, and Keith's retirement account information.

¶ 43 The evidence presented at the bench trial established the following. Keith was 44 years old at the time of the bench trial and was a full-time professor at a local community college. Keith had been working in that capacity since 2001, and his income in that position was fairly consistent. Along with his job at the community college, Keith also made additional income on occasion by teaching part time at other schools and by performing some seasonal tax preparation work. For the prior year, Keith's gross income was approximately $115,600, and he was currently paying to Nadia about $2482 a month in temporary maintenance.

19

¶ 44        Keith had suffered a series of medical problems starting in 2011 and had filed for bankruptcy the first time in 2012 due to financial hardship. The bankruptcy filing was in Keith's name alone and did not affect Nadia. With regard to assets, Keith had the following accounts in his name alone: a state university employee retirement account or pension that had a fair market value of about $945,100, four other retirement accounts that had a combined value of about $23,200, four cryptocurrency accounts that had a combined value of about $1350, a brokerage account that had a value of about $140, and two credit union accounts that had a combined total of about $40. There were also two joint accounts in both parties' names at that same credit union with a combined total of about $240. As for real property, Keith had three vacant lots in Chicago that were purchased in 2010 in his name alone. The lots had no value, according to Keith, because an extensive amount of back taxes and other penalties was owed to the City of Chicago on the lots. Keith had also purchased a townhome in Carol Stream in 2010 in his name alone, but that property was later foreclosed upon. With regard to vehicles, Keith held a 2008 Toyota RAV4 in his name alone that was worth approximately $7490 (Blue Book value) and was currently in Nadia's possession. An additional vehicle that was purchased in Keith's name alone, a Toyota Prius, was repossessed in 2020.

¶ 45        As for debts, Keith owed approximately $113,300 to the City of Chicago for back taxes and other penalties on the three vacant lots, he owed $56,000 to one of the law firms that had previously represented him in the divorce case, he had taken a loan of $48,000 from his father and his father's wife to pay some of his attorney fees and the costs of the proceedings, he had a mortgage deficiency of $47,000 from the foreclosure of the townhome, he had an outstanding balance of approximately $37,800 on his student loans from 2008 and 2009, he owed $13,500 in interim and prospective attorney fees that he had been ordered to pay to Nadia's prior attorneys,

he had borrowed approximately $7050 from his retirement accounts, he owed approximately $10,700 to the IRS for tax obligations from 2017 to 2020, he had borrowed $5000 from a fellow professor at the college, and he owed about $380 in medical bills for A.Y. Keith was not certain, however, whether he was legally obligated to repay some of the debts (the mortgage deficiency, the interim attorney fees, and Keith's prior attorney fees) because the creditors had not pursued those claims in Keith's 2019 bankruptcy proceeding. Keith was also unsure as to the status of his student loan debt because he had challenged that debt under certain federal fraud provisions.

¶ 46　　Nadia was 44 years old at the time of the bench trial (Nadia testified that she was 43, but her financial affidavit indicated that she was 44) and was currently unemployed. Nadia had moved to the United States from Mexico in 2002. She held a college degree from Mexico in teaching Spanish that she had earned in 2002 prior to coming to this country but had never subsequently worked in that field (other than an internship that she had completed in Mexico) because she had difficulty learning the English language. As best as can be determined from the record in this case, Nadia's work history over the years was sporadic. No specific evidence was presented of any employment that Nadia had held during the marriage prior to 2008. From 2008 to 2010, Nadia worked full time for an 18-month period as a store associate at Home Goods and was paid approximately $11 or $11.50 an hour. After A.Y. was born in January 2011, Nadia did not work outside the home again until 2017. From 2017 to 2020, Nadia worked part time for First Student as a school bus monitor. In that position, Nadia was paid approximately $13.50 an hour and worked approximately 22.5 hours per week. Her gross income for that position was about $10,040 per year. In March 2020, Nadia was put on unemployment through First Student. She was supposed to receive about $10,500 in compensation but only collected $500 because she lost the card that she needed to access the compensation funds. Nadia was currently supporting

herself with the temporary maintenance payments that she received from Keith. Nadia had been receiving temporary maintenance for the past 29 months and was seeking to have Keith continue to pay maintenance. Nadia had also recently filed a request in a separate proceeding to have A.Y.'s biological father start paying child support. Nadia hoped to be a preschool teacher at some point but was currently studying to obtain a commercial driver's license so that she could drive a school bus and support herself.

¶ 47      With regard to assets, at the time of trial, Nadia had two bank accounts: one at U.S. Bank that had approximately $12,900 in it from the temporary maintenance payments that she had received and another at Chase Bank that had about $300 in it. Nadia did not own any retirement accounts, investment accounts, or real property, although she had listed real property in Mexico as one of her assets in her most recent financial affidavit.

¶ 48      As for debts, Nadia had approximately $5000 that she owed on her credit cards ($6100 was listed on the most recent financial affidavit) and $1600 that she owed in medical bills for A.Y. that she had forgotten to put on her most recent financial affidavit. When Nadia was asked about the credit card debt by the trial court, she stated that it was her debt and that she felt that she should be the one to have to pay it.

¶ 49      Much of the evidence presented at the bench trial pertained to the possible dissipation of marital assets by Nadia. As to the date of the irretrievable breakdown of the marriage (for the purpose of Keith's dissipation claim), the evidence presented at the bench trial indicated that the parties separated for the first time in approximately November 2010. That initial separation lasted anywhere from two to five months. The parties gave different accounts in their testimony as to what had occurred during that time period. Keith testified that he moved in with another woman during the parties' separation and that he did know at that time that another man was

A.Y.'s biological father. Nadia, on the other hand, testified that Keith threw or drove her out of the house because he was upset that she was pregnant with another man's child. Nadia did not know where Keith went (whether Keith had moved in with another woman) and did not view that time period as a separation. In addition, Nadia felt that having a child by another man did not constitute a breakdown of the marriage because Keith knew about the matter and accepted it. During that initial separation period, each party sought an order of protection against the other but those requests were subsequently withdrawn or dismissed. Eventually, according to Keith's testimony, the parties moved back in together because the woman with whom Keith was living had given him an ultimatum that he had to choose between her and A.Y. and because he was trying to do the right thing for A.Y. The parties lived together after that initial separation until some point in 2017, although Keith maintained in his testimony that the parties stayed in separate bedrooms in the residence that they shared, and Nadia stated in her testimony that the parties had reconciled. Keith testified further that Nadia moved out of their shared residence in May or June 2017, and Nadia stated in her testimony that the parties had been separated since 2017 and that the marriage had broken down in approximately July 2017. Nadia agreed in her testimony, however, that the last 11 years had been miserable for the parties.

¶ 50    As for the assets that were possibly dissipated, when Nadia was called to testify by Keith in Keith's case-in-chief, she acknowledged that Chase Bank account number 0936 was her individual bank account and that Keith did not know about that account. Nadia opened the account in about 2015 in her name alone so that she would have money when she wanted to buy things. She deposited into that account paychecks from her job (starting in 2017) and rental checks from the townhome that the parties owned and had rented out. Nadia did not list that account on her December 2017 financial affidavit and gave conflicting reasons in her testimony

23

for not doing so, stating, at one point, that she did not list the account because it had been closed, and, at another point, that she could not remember why she had not listed the account on her financial affidavit. Nadia was shown various deposits that were made to the account in 2017 and stated that all of those deposits were rental income from the parties' townhome. According to Nadia, she would receive a monthly check from the renters for $1000, would place that check into her account, and would give Keith cash in that amount for the rental payment. Nadia also stated in her testimony, however, that Keith knew that she picked up the rent payment but never asked her what happened to it. When Nadia was asked on the witness stand if the account had more than $22,000 in it in October 2017, she stated that she did not remember.

¶ 51     Nadia admitted during her testimony that she had paid her prior attorneys a $3500 retainer from her individual Chase Bank account. Nadia had also withdrawn approximately $12,000 from the account either shortly before or shortly after the divorce was filed to pay off a vehicle loan that she had cosigned. The loan was for a 2010 Nissan Titan truck. The primary borrower on the loan was Tomas Antonio Flores Alfaro (referred to by Nadia as Tomas Flores), whose wife was Nadia's friend. Nadia cosigned for the loan because Alfaro and his wife had supported Nadia and had taken her in after Keith had thrown Nadia out of the house when she was pregnant. Nadia later sold the vehicle to Nicolas Delgadillo for $7000 in December 2017 after her financial affidavit had been filed. She spent the money on food during a time when she was no longer with Keith. Nadia did not list the vehicle on her December 2017 financial affidavit because the vehicle did not belong to her. Nadia maintained in her testimony, however, that Keith knew about the vehicle. When Nadia was asked how she was able to cosign for a vehicle loan when she was not working and what she put down as her job and income on the loan

24

application, she stated that she did not remember because it was some years ago. Nadia also did not remember if the dealership had run her credit report at the time of the vehicle purchase.

¶ 52 As Nadia's testimony continued, Keith showed Nadia the signature card and some of the bank statements for Chase Bank checking account number 6575. Nadia admitted that her name was listed on the account and that her signature was on the signature card. The other person listed on the account was Juan Jose Leon-Gonzalez, who was a friend of Nadia that she had met at a massage parlor after A.Y. was born. During her testimony, Nadia denied that she had opened the account, that she had access to the account, or that she had made deposits to the account. Nadia did not list the account on her December 2017 financial affidavit because it was not her account. Nadia did not remember whether the account had over $17,000 in it before 2017 or whether she had ever withdrawn money from the account.

¶ 53 In addition to bank accounts, Nadia was asked during her testimony whether she owned any real property in Mexico. Nadia denied that she had acquired any such property during the marriage and also denied that she had told Keith that she had acquired such property. Nadia acknowledged that on her most recent financial affidavit, she had listed real property in Mexico as one of her assets but stated that although her mother had given or left the property to her, or had wanted to do so, the transfer of the property had not yet happened. Rather, when Nadia's mother passed away in May 2020, all of the property went to Nadia's father, who was still alive. Nadia listed the property on her most recent financial affidavit because her mother had told her that the property would eventually be hers. Nadia had no idea what the property was worth and had not done any research to present to the trial court an estimate of the value of the property.

¶ 54 During the bench trial, Keith sought to admit into evidence a printout of the official legal notice posted by the DEA in January 2018 showing that approximately $188,000 had been seized

25

from Nadia in October 2017 under case, proceeding, or reference number 18-DEA-635977. Keith claimed that the notice was evidence of illicit income that Nadia had not reported on her financial affidavit and that the failure to report that information had led to Nadia receiving temporary maintenance. The trial court found that the notice was hearsay and was not admissible. Keith also sought to question Nadia about the method of conception as to A.Y., and the trial court denied that request. In addition, when Keith sought to admit some of the medical progress notes from Nadia's doctor visit in March 2010 where starting fertilization procedures was discussed, the trial court found that the notes were private and confidential to Nadia and denied Keith's request.

¶ 55        After the bench trial had concluded, the trial court took the case under advisement. Approximately two months later, in December 2021, the trial court issued a written order dissolving the parties' marriage and dividing the parties' property. In its written ruling, the trial court, for the most part, divided the parties' marital assets and debts equally between the parties. Three areas of the trial court's ruling, however—maintenance, dissipation, and the division of fees—are of particular relevance in this appeal and require more specific comment.

¶ 56        As to maintenance, the trial court found that an award for Nadia was appropriate based primarily upon the discrepancy in the parties' incomes and work histories. In setting the amount and duration of maintenance to be awarded, the trial court determined that Keith's gross income was approximately $115,600 (the amount listed in Keith's most recent financial affidavit) and imputed an annual income to Nadia of approximately $25,000 (full-time employment at a minimum wage of $12 per hour) because Nadia had voluntarily remained underemployed during the marriage and the dissolution proceedings for the purpose of evading a support obligation. The trial court noted that Keith had filed a motion to compel Nadia to obtain full-time

26

employment, but Nadia had failed to do so. The trial court ultimately ruled that Keith was required to pay Nadia fixed-term maintenance of $1500 per month for 115 consecutive months, after which time, Nadia's right to receive spousal support would be terminated permanently. In setting the amount to be paid, the trial court indicated that it was applying a downward deviation from the guideline maintenance amount because the guideline maintenance amount would exceed the 40% threshold set forth in the statute. See 750 ILCS 5/504(b-1)(1)(A) (West 2018) (providing that the amount calculated as maintenance, when added to the gross income of the payee, may not result in the payee receiving an amount that is in excess of 40% of the combined gross income of the parties). The trial court also set a schedule of various deductions that would be applied temporarily to Keith's maintenance payments to offset amounts that Nadia had dissipated from the marital estate.

¶ 57 With regard to dissipation, based upon the evidence presented at the bench trial, the trial court found that the parties had initially separated several years ago when Keith left the marital residence (presumably, in 2010) but had later reconciled and had lived together for several years thereafter. The trial court, thus, ruled that the date of the irretrievable breakdown of the marriage was January 1, 2017, for dissipation purposes. As for Nadia's Chase Bank account number 0936, the trial court found that the money in the account was marital property and that Nadia had dissipated approximately $15,200 from that account when she withdrew approximately $11,700 to pay off the car loan on the Nissan Titan truck and when she transferred $3500 to her attorneys to pay their fees. The trial court made a similar finding of dissipation with regard to the money kept in Chase Bank account number 6575 (approximately $17,400) that Nadia held with another person, noting that Nadia could not explain the reasons for maintaining the account nor her connection to the co-owner and that Nadia's testimony on the matter was evasive, confusing, and

not credible. The trial court also found that Nadia had dissipated the funds she received ($7000) for the Nissan Titan truck, which had to have been purchased during the marriage and was presumed to be marital property. The trial court subsequently ordered Nadia to reimburse Keith 50% of the three sums that had been dissipated (approximately $7600 for Chase Bank account number 0936, approximately $8700 for Chase Bank account number 6575, and $3500 for the Nissan Titan Truck).

¶ 58     The trial court, however, rejected Keith's claims of dissipation for the property allegedly held by Nadia in Mexico, for the rental income from the parties' townhome, for the amount that Keith had spent for A.Y. over the years, for Nadia's failure to maintain the Chicago properties, and for Keith's increased tax burden due to Nadia's illicit activities.[3] As to the Mexico property, the trial court found that Nadia's current interest in the property was merely an expectancy since the property had not yet been transferred to Nadia, according to Nadia's testimony. In reaching that conclusion, the trial court commented that Keith had not produced any documentary evidence to rebut Nadia's testimony on the matter and that Keith had failed, therefore, to show that an ownership interest actually existed and that it qualified as marital property. The trial court made similar comments about the rental income from the parties' townhome, noting that Keith had failed to rebut Nadia's testimony that she had given the rental income to Keith. With regard to Keith's expenses for A.Y., the trial court found that the legal authority that Keith had cited in support of his claim for dissipation in that regard did not support Keith's position and that the trial court would not reach beyond the date of the irretrievable breakdown of the marriage for the purpose of refunding to Keith his contributions to A.Y.'s support during a time that, according to

_____

[3] During the bench trial, Keith was granted leave to strike his claim of dissipation as to the money that had been seized from Nadia by the DEA. Keith still maintained, however, that the seized money should have been considered as part of Nadia's income in determining whether Nadia should have been awarded temporary maintenance, maintenance, and interim attorney fees.

28

Keith's own testimony, he believed he was fulfilling his obligation to his daughter. As for the Chicago properties, the trial court ruled against Keith's claim of dissipation and commented that no evidence was presented to show that the tax bills, penalties, and/or administrative fees for the properties amounted in any way to a dissipation of marital assets by Nadia. The trial court ordered that the Chicago properties be sold and that the net proceeds be divided between the parties. Finally, with regard to Keith's increased tax burden, the trial court ruled against Keith on that dissipation claim as well, noting that although Keith's financial affidavit showed an IRS debt of over $10,000, Keith had failed to present any documentary evidence to support or prove illicit activity by Nadia.

¶ 59        As for the division of fees, the trial court granted Keith's request to reallocate the percentage of the GAL fees that each party was required to pay, which had previously been set at 80% to be paid by Keith and 20% to be paid by Nadia. After considering the extent of Nadia's dissipation of marital assets and certain other matters, the trial court ordered that each of the parties was required to pay 50% of the GAL fees. With regard to the $13,500 debt owed to Nadia's prior attorneys for interim attorney fees, the trial court ruled that Nadia was responsible for that debt.

¶ 60        Within 30 days after the judgment of dissolution of marriage was entered, Keith filed a motion to vacate the judgment, which the trial court treated as a motion to reconsider and subsequently denied. Keith appealed.

¶ 61                                    II. ANALYSIS

¶ 62        On appeal, Keith argues that the trial court erred in: (1) requiring him to proceed to a bench trial in this case without first forcing Nadia to comply with his discovery requests and the trial court's discovery orders; (2) awarding temporary maintenance and maintenance to Nadia;

29

(3) determining Nadia's dissipation of marital assets; and (4) certain other aspects of its ruling. We will address each of those arguments in turn. Although Nadia has not filed an appellee's brief in this case, we will, nevertheless, address the merits of this appeal, pursuant to the principles set forth in *First Capitol Mortgage Corp. v. Talandis Construction Corp.*, 63 Ill. 2d 128, 133 (1976) (indicating that in the absence of an appellee's brief, a reviewing court should decide an appeal on the merits if the record is simple and the claimed errors are such that the court may easily decide the issues raised by the appellant without the aid of an appellee's brief).

¶ 63                             A. Requiring Keith to Proceed to Trial

¶ 64          As noted above, as his first point of contention on appeal, Keith argues that the trial court erred in requiring him to proceed to a bench trial in this case without first forcing Nadia to comply with his discovery requests and the trial court's discovery orders. Specifically, Keith maintains, Nadia failed to tender her bank statements, her documents pertaining to the property or properties in Mexico, and her records regarding the fertilization procedures that she underwent prior to the conception of A.Y., despite Keith's repeated requests for those discovery materials and the trial court's repeated orders requiring Nadia to tender those materials. According to Keith, the trial court was unwilling to take any substantive action against Nadia to force Nadia to comply with discovery requests and orders, and the trial court's failure to do so blocked any meaningful pretrial discovery in this case. Based upon that alleged error, Keith asks this court to set aside the trial court's judgment and to grant Keith's motion for a default judgment against Nadia or to remand this case for a new bench trial with instructions to the trial court to compel Nadia to comply with Keith's discovery requests and the trial court's discovery orders.

¶ 65          The purpose of the discovery rules is to obtain a prompt, efficient, and final determination of disputes in accordance with the substantive rights of the parties. See *Kaull v.*

30

*Kaull*, 2014 IL App (2d) 130175, ¶ 29. In keeping with that purpose, the discovery rules for civil cases require full disclosure of information that is not privileged and that is relevant to the issues in the lawsuit. See Ill. S. Ct. R. 201(b) (eff. Jul. 1, 2014); *Kaull*, 2014 IL App (2d) 130175, ¶ 44. To enforce the discovery rules, Illinois Supreme Court Rule 219(c) (eff. July 1, 2002) authorizes a trial court to impose sanctions upon any party who unreasonably fails to comply with the discovery rules or with any order entered pursuant to those rules. *Shimanovsky v. General Motors Corp.*, 181 Ill. 2d 112, 120 (1998). As a discovery sanction under Rule 219(c), a trial court may, among other things, prohibit an offending party from maintaining any particular claim, counterclaim, third-party complaint, or defense to which the discovery issue pertains or require the offending party to pay the opposing party's costs and attorney fees. See Ill. S. Ct. R. 219(c)(iii) (eff. July 1, 2002); *In re Marriage of Bradley*, 2011 IL App (4th) 110392, ¶ 19.

¶ 66    When imposing sanctions under Rule 219(c), the trial court's purpose is to coerce compliance with discovery rules and orders and not to punish the offending party. *Bradley*, 2011 IL App (4th) 110392, ¶ 20. To the extent possible, therefore, the sanctions imposed by the trial court should insure both discovery and a trial on the merits. See *Shimanovsky*, 181 Ill. 2d at 123. Sanctions that essentially end the litigation, such as the grant of a dismissal with prejudice or the entry of a default judgment, are drastic sanctions that should be invoked only as a last resort after all of the court's other enforcement powers have failed to advance the litigation and only when the offending party's actions show a deliberate, contumacious, or unwarranted disregard of the trial court's authority. *Id.*

¶ 67    In deciding whether to impose a sanction on a party under Rule 219(c) and the appropriate sanction to be imposed, the trial court should consider the following factors: (1) the surprise to the adverse party (the party moving for sanctions); (2) the prejudicial effect of the

31

proffered testimony or evidence; (3) the nature of the testimony or evidence; (4) the diligence of the adverse party in seeking discovery; (5) the timeliness of the adverse party's objection to the testimony or evidence; and (6) the good faith of the party offering the testimony or evidence. *Id.* at 124. No single factor, however, is determinative in the analysis. *Id.*

¶ 68 A trial court's decision on a request for Rule 219(c) sanctions will not be reversed on appeal absent an abuse of discretion. See *id.* at 120. The threshold for finding an abuse of discretion is high one and will not be overcome unless it can be said that the trial court's ruling was arbitrary, fanciful, or unreasonable, or that no reasonable person would have taken the view adopted by the trial court. See *Blum v. Koster*, 235 Ill. 2d 21, 36 (2009); *In re Leona W.*, 228 Ill. 2d 439, 460 (2008).

¶ 69 In the present case, after reviewing the record, we find that the trial court did not err in the manner in which it addressed Nadia's compliance with Keith's discovery requests and the trial court's discovery orders. We reach that conclusion for three main reasons. First, contrary to Keith's assertion on appeal, the trial court did not ignore Keith's requests for relief with regard to Nadia's failure, at times, to tender discovery. Rather, our review of the record indicates that the trial court frequently addressed Keith's requests for relief by attending to the pending discovery issues at the pretrial status hearings and by making rulings on those issues. Instead of imposing sanctions upon Nadia to force compliance, which would have resulted in further delays in the proceedings, the trial court sought to resolve the pending discovery issues in a more permanent and efficient manner by questioning the parties directly about the underlying areas to which the discovery issues pertained—such as whether Nadia had additional bank accounts, whether she owned real property in Mexico, and whether A.Y had been conceived through fertilization procedures—and by ordering Nadia to produce certain documents or to comply with Keith's

discovery requests. While it does appear, in hindsight, that the trial court may have received untruthful responses at times to its inquiries, we cannot conclude that the trial court's procedure with regard to discovery issues was flawed. To the contrary, we believe that the trial court took a fair and reasonable approach to resolving the discovery issues in this case, a case in which both parties were self-represented and did not know how to proceed, one of the parties had some level of difficulty understanding the English language, and all of the communications and court directives to that party had to be communicated through an interpreter.

¶ 70    Second, much of the uncertainty in the discovery process in this case was caused or contributed to by Keith and his lack of knowledge on how to proceed or the manner by which he chose to proceed. The trial court record in this case is cluttered with Keith's repeated filings, some of which were later withdrawn, and others of which were never specifically ruled upon. It appears from the record before us that, rather than follow a systematic procedure to try to have the discovery issues resolved in this case, Keith would often simply file the same or similar motions, requests, or petitions (collectively referred to in the remainder of this paragraph as motions) over and over again, such that there was no progression in his attempts to obtain Nadia's compliance with discovery and it would have been difficult for the trial court to readily determine which motions were actually still pending and which had been abandoned. Indeed, as Keith's own argument indicates, he had approximately 18 motions pending at one time. Rather than repeatedly filing the same motions over and over again, Keith would have been better served to file a motion for specific reasonable sanctions or a petition for rule to show cause to either compel Nadia to comply with discovery or to impose consequences upon Nadia for her failure to do so and to keep the case moving forward. Instead, when Keith did seek to obtain sanctions against Nadia for her failure to comply, he sought the most drastic sanctions

33

available—to have a summary or default judgment entered against Nadia—which the trial court was not likely to grant under the circumstances of the present case. See *Shimanovsky*, 181 Ill. 2d at 123.

¶ 71    Third, other than the delay in the proceedings in this case, we find that Keith was generally not prejudiced by the trial court's decision not to impose Rule 219(c) sanctions against Nadia for her failure to comply with discovery. Most of the documents about which Keith complains related to the issue of dissipation, and it appears from the record that Keith eventually obtained or received sufficient documentation to prevail upon many of his claims on that issue.

¶ 72                    B. Awarding Temporary Maintenance and Maintenance to Nadia

¶ 73    As his second point of contention on appeal, Keith argues that the trial court erred in awarding temporary maintenance and maintenance to Nadia. In support of that argument, Keith makes two primary assertions. First, Keith asserts that temporary maintenance and maintenance should not have been awarded (and that temporary maintenance should have been terminated after it was erroneously awarded) because Nadia failed to support her request for temporary maintenance and maintenance with any financial documentation, despite the statutory requirement for Nadia to do so. In making that assertion, Keith notes that he repeatedly pointed out to the trial court that Nadia had failed to comply with discovery and had failed to turn over her bank statements, but the trial court was unwilling to take substantive action against Nadia and ignored Keith's multiple petitions to terminate temporary maintenance. Second, Keith asserts, although somewhat implicitly, that temporary maintenance and maintenance should not have been awarded because the money that the DEA seized from Nadia should have been included in Nadia's gross income and considered by the trial court in deciding whether to award temporary maintenance and maintenance. According to Keith, the federal tax law on this subject

34

is clear that money from illegal activities is taxable income to a taxpayer. Thus, for both of the reasons stated, Keith asks that that we vacate the trial court's award of temporary maintenance (and, presumably, maintenance), that we order Nadia to refund all of the temporary maintenance (and, presumably, maintenance) that Keith has paid, and that we bar Nadia from receiving maintenance from Keith. In the alternative, Keith asks that we remand this matter to the trial court to recalculate the temporary maintenance and maintenance awards with instructions to the trial court to consider the money seized by the DEA as part of Nadia's income in performing that recalculation.

¶ 74        The Illinois Marriage and Dissolution of Marriage Act (Act) provides for awards of both temporary maintenance and maintenance. See 750 ILCS 5/501(a)(1) (West 2018) (providing for an award of temporary maintenance); 750 ILCS 5/504(a) (West 2018) (providing for an award of maintenance). A trial court has broad discretion in ruling upon a request for such an award, and its decision in that regard will not be reversed on appeal absent an abuse of that discretion. See *In re Marriage of Burdess*, 2020 IL App (3d) 190342, ¶ 31 (stating the standard of review for a temporary maintenance award); *In re Marriage of Donovan*, 361 Ill. App. 3d 1059, 1062 (2005) (stating the standard of review for a maintenance award). As noted above, the threshold for finding an abuse of discretion is a high one and will not be overcome unless it can be said that the trial court's ruling was arbitrary, fanciful, or unreasonable, or that no reasonable person would have taken the view adopted by the trial court. See *Blum*, 235 Ill. 2d at 36; *Leona W.*, 228 Ill. 2d at 460. However, when a party challenges a trial court's factual findings that underlie a maintenance award, those findings will not be disturbed on appeal unless they are against the manifest weight of the evidence. *In re Marriage of Stine*, 2023 IL App (4th) 220519, ¶ 16. A finding is against the manifest weight of the evidence only if it is clearly apparent from the

record that the trial court should have reached the opposite conclusion or if the finding itself is unreasonable, arbitrary, or not based upon the evidence presented. See *Best v. Best*, 223 Ill. 2d 342, 350 (2006).

¶ 75    An award of temporary maintenance in a dissolution of marriage proceeding is governed by section 501 of the Act (750 ILCS 5/501 (West 2018)). Under section 501, either party in a marriage dissolution proceeding may petition the trial court for temporary relief, including an award of temporary maintenance. See 750 ILCS 5/501(a) (West 2018). One of the main purposes of temporary maintenance is to balance the equities between the parties as fairly as possible while the dissolution case is pending. See *In re Marriage of Hochstatter*, 2020 IL App (3d) 190132, ¶ 16. A petition for temporary maintenance must be accompanied by a statewide standard-form financial affidavit that demonstrates the factual basis for the relief requested and that is supported by income tax returns, pay stubs, bank statements, and other documentary evidence. See 750 ILCS 5/501(a)(1) (West 2018); 16A Tracy Bateman *et al.*, Illinois Law and Practice, Divorce; Dissolution of Marriage § 104 (Jan. 2023 update); 12 Jody Meyer Yazici *et al.*, Illinois Practice, Family Law § 501 (2023 ed.) (author's note 9). Pursuant to section 501, issues concerning temporary maintenance are generally to be resolved by the trial court in a summary manner based upon the allocated parenting time, financial affidavits, tax returns, pay stubs, bank statements, and other relevant documentation of the parties. 750 ILCS 5/501(a) (West 2018). An evidentiary hearing, however, may be held upon a showing of good cause, and the trial court is required to impose significant penalties and sanctions upon a party that intentionally or recklessly files an inaccurate or misleading financial affidavit in connection with a request for temporary maintenance or other temporary relief. See *id.*; Yazici, *supra* (author's notes 4, 9). In determining whether to award temporary maintenance, the trial court must

36

consider the entire financial situation of both of the parties (the parties' income and assets and what is required to support the party seeking maintenance). *Burdess*, 2020 IL App (3d) 190342, ¶ 31. An award of temporary maintenance does not prejudice the rights of the parties, which are to be adjudicated at subsequent hearings in the proceeding, and terminates when the final judgment is entered or when the petition for dissolution is dismissed. 750 ILCS 5/501(d) (West 2018); *Hochstatter*, 2020 IL App (3d) 190132, ¶¶ 16-17.

¶ 76        An award of maintenance, on the other hand, is governed by section 504 of the Act (750 ILCS 5/504 (West 2020)). Under section 504, a "court may grant a maintenance award for either spouse [in a dissolution of marriage proceeding] in amounts and for periods of time as the court deems just, without regard to marital misconduct, and the maintenance may be paid from the income or property of the other spouse." 750 ILCS 5/504(a) (West 2018). When ruling upon a request for spousal maintenance, the trial court must first determine whether an award of maintenance is appropriate. See *id.* In making that determination, the trial court shall consider all relevant factors, including the following: (1) the income and property of each party, including marital property apportioned and non-marital property assigned to the party seeking maintenance as well as all financial obligations imposed on the parties as a result of the dissolution of marriage; (2) the needs of each party; (3) the realistic present and future earning capacity of each party; (4) any impairment of the present and future earning capacity of the party seeking maintenance due to that party devoting time to domestic duties or having forgone or delayed education, training, employment, or career opportunities due to the marriage; (5) any impairment of the realistic present or future earning capacity of the party against whom maintenance is sought; (6) the time necessary to enable the party seeking maintenance to acquire appropriate education, training, and employment, and whether that party is able to support himself or herself

through appropriate employment or any parental responsibility arrangements and its effect on the party seeking employment; (7) the standard of living established during the marriage; (8) the duration of the marriage; (9) the age, health, station, occupation, amount and sources of income, vocational skills, employability, estate, liabilities, and the needs of each of the parties; (10) all sources of public and private income including, without limitation, disability and retirement income; (11) the tax consequences of the property division upon the respective economic circumstances of the parties; (12) contributions and services by the party seeking maintenance to the education, training, career or career potential, or license of the other spouse; (13) any valid agreement of the parties; and (14) any other factor that the court expressly finds to be just and equitable. *Id.* No one factor, however, is dispositive in determining whether maintenance should be awarded. See *In re Marriage of Harlow*, 251 Ill. App. 3d 152, 157 (1993) (discussing a previous version of the Act). In addition, the trial court does not have to give equal weight to each of the factors, as long the balance struck by the trial court is reasonable under the circumstances. *In re Marriage of Dunlap*, 294 Ill. App. 3d 768, 772 (1998). When determining whether a maintenance award is appropriate, the trial court shall state its reasoning and make specific findings of fact referencing each of the relevant factors listed above. 750 ILCS 5/504(b-2)(1) (West 2018). If the trial court finds that an award of maintenance is appropriate, it shall then determine the amount and duration of maintenance in accordance with the provisions of section 504(b-1) of the Act. *Id.* § 504(b-1).

¶ 77 In the present case, after reviewing the record and considering Keith's specific claims, we find that the trial court did not err in determining that both a temporary maintenance award and a maintenance award were appropriate for Nadia and in setting the amount and duration of those

awards.[4] As for temporary maintenance, we are not persuaded by Keith's claim that Nadia's request should have been denied from the outset due to Nadia's failure to tender any bank statements or other financial documents in support of her financial affidavit. By our view, Nadia's failure to tender or submit her supporting financial documents would not automatically defeat her request for temporary maintenance but, rather, would require the trial court to make a credibility determination as to any income or expenses set forth by Nadia. See *In re Marriage of Greenberg*, 102 Ill. App. 3d 938, 942 (1981) (indicating that the fact that the respondent's affidavit provided estimated expenses, rather than actual expenses, was adequately brought to the trial court's attention, along with the respondent's assertion that the estimated expenses would soon become actual expenses, such that the matter was a question of credibility for the trial court to determine). In reaching that conclusion, we note that it was initially Keith who had failed to provide his financial information and that Nadia had to file a rule to show cause to compel Keith to do so. We also point out that we have not been provided with a transcript of the April 2018 proceeding when the trial court made its decision on temporary maintenance. We, thus, have no way of knowing the reasoning behind the trial court's decision and must presume that the trial court's ruling was correct and in conformance with the law. See *Foutch v. O'Bryant*, 99 Ill. 2d 389, 391-92 (1984) (recognizing that an appellant has the burden to present a sufficiently complete record of the proceedings in the trial court to support a claim of error and that, in the absence of such a record on appeal, the appellate court will presume that the order entered by the

---

[4] We recognize that there is some uncertainty among the courts as to whether, and to what extent, an award of temporary maintenance may be challenged on appeal. See, *e.g.*, *In re Marriage of Dunseth*, 260 Ill. App. 3d 816, 827-28 (1994) (indicating that after a final order has been entered, an award of temporary maintenance may be challenged on appeal only to the extent that the temporary award is continued in effect by the final order). We take no position on that issue here, however, because the appellee has not filed a brief in this case and that particular issue, therefore, has not been raised.

trial court was in conformity with law and had a sufficient factual basis). We, therefore, affirm the trial court's award of temporary maintenance.

¶ 78    Turning to maintenance, it is clear from the record before us and the trial court's written ruling that the trial court considered the applicable factors listed above in determining whether an award of maintenance was appropriate. The trial court ultimately concluded that such an award was appropriate for Nadia and stated the specific reason for that conclusion in its written ruling—that its decision was based primarily upon the discrepancy in the parties' incomes and work histories. The factual findings underlying the trial court's determination in that regard (the parties' incomes and work histories) were generally not in dispute at the bench trial, other than the potential impact of the money that had allegedly been seized from Nadia, and were well supported by the testimony and documentary evidence presented.

¶ 79    Although Keith sought to admit a printout of the DEA seizure notice to try to establish that the seized money should be considered as part of Nadia's gross income for the purpose of maintenance, the trial court was well within its discretion to deny that request. See *Leona W.*, 228 Ill. 2d at 460 (noting that a trial court's ruling on the admissibility of evidence will not be reversed on appeal absent an abuse of discretion). It does not appear from the record that Keith presented a certified copy of the DEA posting and there is no indication that Keith asked the trial court to take judicial notice of the posting or of anything related to the seizure/forfeiture. In addition, the posting did not indicate the end result of the DEA's seizure or forfeiture proceeding against Nadia, and Keith was unable to elicit any information about the seizure/forfeiture from Nadia during her testimony because Nadia had asserted her fifth amendment right not to answer questions about the matter. Keith has not challenged that particular aspect of the trial court's

40

ruling (whether the trial court should have allowed Nadia to assert her fifth amendment rights to Keith's questioning) in this appeal.

¶ 80    In addition, while Keith claims that the trial court should have compelled Nadia to find gainful employment and that the trial court doing so could have had a significant impact on the maintenance determination, we are not persuaded by Keith's claim in that regard. Contrary to Keith's assertion on appeal, the trial court did not ignore Keith's motion to compel employment. Rather, the record in this case shows that shortly before the bench trial, the trial court addressed Keith's concern and explained to Keith that it could either require Nadia to perform a job search or impute approximately $20,000 of income to Nadia. Keith responded to that explanation by saying, "[o]kay." Keith presented no evidence at the bench trial to suggest that Nadia could currently obtain employment at a higher hourly wage level (the annual income that the trial court imputed to Nadia was already based upon Nadia working full time), and the trial court had already determined in imputing income to Nadia that Nadia had voluntarily remained underemployed for the purpose of evading a support obligation.

¶ 81    As for the amount and duration of the trial court's maintenance award, it is clear from the record before us and the trial court's written ruling that the trial court followed the statutory guidelines in making its decision. As indicated above, in determining the amount of maintenance to be awarded, the trial court imputed a certain level of income to Nadia based upon a finding that Nadia had been underemployed for the purpose of evading a support obligation. Imputing income in that manner was consistent with the representations that the trial court had made to the parties at the prior status hearing. In addition, the trial court found that a downward deviation from the guideline maintenance amount was required because the guideline maintenance amount would have exceeded the 40% threshold set forth in the statute. See 750 ILCS 5/504(b-1)(1)(A)

41

(West 2018) (providing that the amount calculated as maintenance, when added to the gross income of the payee, may not result in the payee receiving an amount that is in excess of 40% of the combined gross income of the parties). In determining the duration of maintenance to be awarded, the trial court applied the formula that was set forth in the statute, which was based upon the length of the parties' marriage. See *id.* § 504(b-1)(1)(B) (establishing that the duration of a guideline maintenance award is to be determined by multiplying the length of a marriage by a certain factor). Keith does not challenge the factual findings underlying the trial court's determination or the trial court's mathematical calculations, and we cannot conclude that the trial court's ultimate determination of maintenance was arbitrary, fanciful, or unreasonable, or that no reasonable person would have taken the view adopted by the trial court. See *Blum*, 235 Ill. 2d at 36; *Leona W.*, 228 Ill. 2d at 460. We, therefore, uphold the trial court's maintenance award.

¶ 82                                C. Determining Dissipation of Marital Assets

¶ 83        As his third point of contention on appeal, Keith argues that the trial court erred in determining Nadia's dissipation of marital assets in the present case. In support of that argument, Keith asserts that the trial court made two mistakes in its dissipation ruling: (1) the trial court incorrectly found that the date of the irretrievable breakdown of the marriage was January 1, 2017, even though the evidence presented at the bench trial showed that the parties had separated in 2010 and had never reconciled after that point; and (2) the trial court incorrectly found that Keith could not claim dissipation as to his expenses over the years for A.Y., even though A.Y. was born outside the marriage (according to Keith).

¶ 84        In a dissolution of marriage proceeding, if a claim for dissipation has been properly raised and presented, the trial court must consider that claim in dividing the marital property. See 750 ILCS 5/503(d)(2) (West 2016); *In re Marriage of Brown*, 2015 IL App (5th) 140062, ¶ 71.

Dissipation occurs when one spouse uses a marital asset for his or her sole benefit and for a purpose unrelated to the marriage at a time when the marriage is undergoing an irreconcilable breakdown. *In re Marriage of Tietz*, 238 Ill. App. 3d 965, 983 (1992). If the claiming party makes a *prima facie* showing that dissipation has occurred, the burden shifts to the party charged with dissipation to prove by clear and specific evidence (clear and convincing evidence) how the funds were used. See *Brown*, 2015 IL App (5th) 140062, ¶ 66. If the funds were spent for legitimate family expenses and necessary and appropriate purposes, no dissipation will be found. *Tietz*, 238 Ill. App. 3d at 983. General and vague statements that the funds were spent on marital expenses or used to pay bills, however, are insufficient to avoid a finding of dissipation. *Id.* at 984. In addition, if the expenditures are not adequately documented by the party charged with dissipation, a trial court's finding of dissipation will be upheld. *Id.*

¶ 85　　　　The decision of whether dissipation has occurred is a fact intensive inquiry that depends upon the unique facts of each individual case and often calls upon the trial court to make a credibility determination as to the explanation given by the party charged with dissipation on how the marital funds were used. See *Brown*, 2015 IL App (5th) 140062, ¶ 59*; Tietz*, 238 Ill. App. 3d at 983-84. A trial court's ruling on dissipation, therefore, will not be reversed on appeal unless it is against the manifest weight of the evidence. *Vancura*, 356 Ill. App. 3d at 204-05. As noted above, a finding is against the manifest weight of the evidence only if it is clearly apparent from the record that the trial court should have reached the opposite conclusion or if the finding itself is unreasonable, arbitrary, or not based upon the evidence presented. See *Best*, 223 Ill. 2d at 350.

¶ 86　　　　In the present case, after reviewing the record, we find that the trial court did not err in its ruling on dissipation. Regarding the irretrievable breakdown of the marriage, contrary to Keith's

assertion on appeal, conflicting evidence was presented at the bench trial as to when the irretrievable breakdown occurred. Keith's testimony indicated that the irretrievable breakdown took place in 2010 when the parties separated and Keith moved in with another woman. Keith acknowledged, however, that the parties resumed living together after that time period but denied that the parties had reconciled or had shared a bedroom and stated that the parties were merely living together so that Keith could spend time with A.Y. Nadia, on the other hand, testified that she did not view the parties' 2010 difficulties as a separation and stated that the parties had reconciled after that time period. Nadia testified further that the parties had been separated since 2017 and estimated that the irretrievable breakdown of the marriage occurred in July 2017. In light of the conflicting testimony presented at the bench trial, the trial court's ruling—that the irretrievable breakdown of the marriage took place in January 2017—was not against the manifest weight of the evidence and must be upheld. See *Vancura*, 356 Ill. App. 3d at 204-05; *Best*, 223 Ill. 2d at 350. In reaching that conclusion, we note that Keith has not presented any specific argument in this appeal as to how he was prejudiced by the trial court's determination of the date of the irretrievable breakdown of the marriage. See *Detention of Traynoff*, 358 Ill. App. 3d 430, 441 (2005) (recognizing that trial court error is reversible on appeal only if the appellant has shown that the error was substantially prejudicial to the appellant). We, therefore, reject Keith's first claim of error on this issue.

¶ 87          As for Keith's expenses relating to A.Y., we agree with the trial court that those expenses did not constitute dissipation of the marital assets. As the trial court correctly noted, the expenses were incurred at a time when Keith was enjoying a parent-child relationship with A.Y. and was fulfilling what he believed to be his parental obligations toward the child. Indeed, the record in this case shows that at one point, Keith even fought off an attempt by Nadia to disestablish the

44

parent-child relationship between Keith and A.Y. The fact that Keith eventually changed his stance on the matter and ultimately decided not to maintain his legal relationship with regard to A.Y. does not in any way undermine the trial court's conclusion on this issue. Nor do we believe that the legal authority cited by Keith, *In re Marriage of Charles*, 284 Ill. App. 3d 339, 343-44 (1996), supports his position on this issue. The facts of *Charles*—where the trial court failed to consider the issue of dissipation in a case in which a husband had used marital funds to pay his mistress's expenses and child support for his and his mistress's child—are readily distinguishable from the facts of the present case. See *id.* We, therefore, also reject Keith's second claim of error on this issue.

¶ 88                                   D. Certain Other Aspects of the Trial Court's Ruling

¶ 89          As his fourth and final point of contention on appeal, Keith argues that the trial court erred in certain other aspects of its ruling. Specifically, Keith asserts that the trial court erroneously: (1) ignored Keith's motion to compel employment; (2) failed to divide the debts on the Chicago properties between the parties; and (3) required Keith to pay interim attorney and GAL fees, even though Nadia and her attorneys had failed to disclose Nadia's assets and accounts, including the seized money. Based upon those errors and the other errors asserted in this case, Keith asks that we vacate the trial court's dissolution judgment and remand this case for a new bench trial on the matter.

¶ 90          Most of Keith's allegations of error under this issue have been addressed previously in this order and need only be commented upon briefly here. As for the motion to compel employment, the record does not support Keith's claim that the trial court ignored that motion. Rather, the record shows that the trial court explained to Keith that it could either require Nadia to perform a job search or impute a certain amount of income to Nadia. Keith responded,

45

"[o]kay," to that explanation, and the trial court eventually imputed income to Nadia in its final judgment in determining whether an award of maintenance was appropriate for Nadia and in setting the amount of that award. With regard to the debts for the Chicago properties, again, the record before us does not support Keith's claim of error in that regard. The trial court ordered that the properties be sold, that all debts and expenses of the sale be paid, and that any remaining funds from the sale be divided equally between the parties. There is no indication in the record before us that the debts on the properties would exceed the sale value. Keith is free, however, to raise the issue by motion (or petition) and supporting documents in the trial court if such is the case and to have the debts allocated between the parties. Finally, as for the interim attorney and GAL fees, we do not believe that Keith's assertion of error is supported by the record or that the trial court abused its discretion in making its ruling. See *In re Estate of K.E.S.*, 347 Ill. App. 3d 452, 468 (2004) (applying an abuse of discretion standard of review on appeal to a trial court's determination of who must pay GAL fees); *In re Marriage of Patel*, 2013 IL App (1st) 122882, ¶ 37 (applying an abuse of discretion standard of review on appeal to a trial court's award of interim attorney fees). In the final judgment, the trial court assigned to Nadia the attorney fee balance that was left over from the prior interim attorney fee award in her favor. Thus, Keith has been relieved, for the most part, of that obligation. The trial court also in its final judgment reallocated the percentage of the GAL fees that each party was to pay and reduced Keith's percentage from 80% to 50%. At the time of its ruling in that regard, the trial court was well aware of the marital assets that had been in Nadia's possession, her failure to disclose those assets to Keith, and her ultimate dissipation of those assets. Although Keith claims that the trial court should have considered the seized money in making its determination, we have already

rejected that claim previously in this order. We, therefore, deny all of Keith's claims of error under this particular issue.

¶ 91                                III. CONCLUSION

¶ 92          For the foregoing reasons, we affirm the judgment of the circuit court of Du Page County.

¶ 93          Affirmed.